INTERNATIONAL LONGSHOREMEN'S ASSOCIA-
TION, LOCAL 1416, AFL–CIO *v.* ARIADNE
SHIPPING CO., LTD., ET AL.

No. 231.   Argued January 13, 1970—
Decided March 9, 1970

*Seymour M. Waldman* argued the cause for petitioner. With him on the briefs were *Louis Waldman, Martin Markson,* and *Seymour A. Gopman.*

*Richard M. Leslie* argued the cause for respondents. With him on the brief was *Thomas H. Anderson.*

*Solicitor General Griswold, Arnold Ordman, Dominick L. Manoli,* and *Norton J. Come* filed a memorandum for the National Labor Relations Board as *amicus curiae.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question presented here is whether the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*, pre-empts state jurisdiction to enjoin peaceful picketing protesting substandard wages paid by foreign-flag vessels to American longshoremen working in American ports. The Florida courts held that there was no pre-emption, citing *McCulloch* v. *Sociedad Nacional*, 372 U. S. 10 (1963), and *Incres Steamship Co.* v. *International Maritime Workers Union*, 372 U. S. 24 (1963). We granted certiorari. 396 U. S. 814 (1969). We reverse.

In 1966 the respondents, a Liberian corporation and a Panamanian corporation, operated cruise ships to the Caribbean from Port Everglades and Miami, Florida. Respondent Ariadne Shipping Company operated the S. S. *Ariadne,* of Liberian registry, with a crew subject to Liberian ship's articles. Respondent Evangeline Steamship Company operated S. S. *Bahama Star,* of Panamanian registry, with a crew subject to Panamanian ship's articles. The uncontradicted evidence showed that "[l]oading of the ship, stowage and loading of automobiles, loading cargo and ship stowage" occurred whenever either vessel berthed at Port Everglades or Miami, "[p]art of it [performed] by employees of the ship and some of it by outside labor." The petitioner is a labor organization representing longshoremen in the Miami area. Although none of those doing the longshore work for the ships belonged to the union, whenever either vessel docked at Port Everglades or Miami in May 1966, petitioner stationed a picket near the vessel to patrol with a placard protesting that the longshore

work was being done under substandard wage conditions.[1] Respondents obtained temporary injunctive relief against the picketing from the Circuit Court for Dade County.[2] That court rejected petitioner's contention that the subject matter was pre-empted, holding that under *McCulloch* the picketing was beyond the reach of the regulatory power of the National Labor Relations Board, and hence could be enjoined, since it violated Florida law. The temporary injunction was affirmed by the District Court of Appeal for the Third District of Florida in a brief *per curiam* order citing *McCulloch* and *Incres*. 195 So. 2d 238 (1967). Thereafter the Circuit Court, without further hearing, made the injunction permanent. The District Court of Appeal again affirmed, although noting that the testimony "tended to show" that the picketing was carried on to protest against the substandard wages paid for the longshore work. 215 So. 2d 51,

---

[1] A picket was also stationed in front of the terminal through which passengers embarked and disembarked. This picket carried a sign alleging that the ships were unsafe, and passed out handbills to the same effect.

[2] The injunctive order was in four paragraphs. Paragraphs 1 and 2 prohibited picketing with signs, or distributing handbills stating, alleging, or inferring that the vessels were unsafe. The petitioner abandoned its appeal from these provisions and they are not before us. Paragraph 4 was set aside on appeal. See n. 3, *infra*. Paragraph 3 therefore is the only provision under review in this Court. It prohibits petitioner from:

"Picketing or patrolling with signs or placards indicating or inferring that a labor dispute exists between [respondents] and [petitioner], by any statement, legend or language alleging [that respondents] pay their employees substandard wages."

Initially petitioner directed the picketing not at respondents' ships but at Eastern Steamship Lines, Inc., a Florida corporation that acted as respondents' general agent. Eastern obtained a temporary injunction, 193 So. 2d 73 (1966), whereupon petitioner shifted the picketing to the ships themselves.

53 (1968).[3]   The Supreme Court of Florida denied review in an unreported order.

*McCulloch* and *Incres* construed the National Labor Relations Act to preclude Board jurisdiction over labor disputes concerning certain maritime operations of foreign-flag vessels.   Specifically, *Incres,* 372 U. S., at 27, held that "maritime operations of foreign-flag ships employing alien seamen are not in 'commerce' within the meaning of § 2 (6) [of the Act]."   See also *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138 (1957).   This construction of the statute, however, was addressed to situations in which Board regulation of the labor relations in question would necessitate inquiry into the "internal discipline and order" of a foreign vessel, an intervention thought likely to "raise considerable disturbance not only in the field of maritime law but in our international relations as well."   *McCulloch,* 372 U. S., at 19.

In *Benz* a foreign-flag vessel temporarily in an American port was picketed by an American seamen's union, supporting the demands of a foreign crew for more favorable conditions than those in the ship's articles which they signed under foreign law, upon joining the vessel in a foreign port.   In *McCulloch* an American seamen's union petitioned for a representation election among the foreign crew members of a Honduran-flag vessel who were already represented by a Honduran union, certified under Honduran labor law.   Again, in *Incres* the picketing was by an American union formed "for the primary purpose of organizing foreign seamen on foreign-flag ships." 372 U. S., at 25–26.   In these cases, we concluded that, since the Act primarily concerns strife between

---

[3] The Court of Appeal set aside paragraph 4 of the injunction which prohibited "[b]y any manner or by any means, including picketing or the distribution of handbills, inducing or attempting to induce customers and potential customers of [respondents] to cease doing business with [respondents]."   215 So. 2d, at 52 n. 1.

American employers and employees, we could reasonably expect Congress to have stated expressly any intention to include within its coverage disputes between foreign ships and their foreign crews. Thus we could not find such an intention by implication, particularly since to do so would thrust the National Labor Relations Board into "a delicate field of international relations," *Benz*, 353 U. S., at 147. Assertion of jurisdiction by the Board over labor relations already governed by foreign law might well provoke "vigorous protests from foreign governments and . . . international problems for our Government," *McCulloch*, 372 U. S., at 17, and "invite retaliatory action from other nations," *id.*, at 21. Moreover, to construe the Act to embrace disputes involving the "internal discipline and order" of a foreign ship would be to impute to Congress the highly unlikely intention of departing from "the well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship," a principle frequently recognized in treaties with other countries. *Ibid.*

The considerations that informed the Court's construction of the statute in the cases above are clearly inapplicable to the situation presented here. The participation of some crew members in the longshore work does not obscure the fact that this dispute centered on the wages to be paid American residents, who were employed by each foreign ship not to serve as members of its crew but rather to do casual longshore work. There is no evidence that these occasional workers were involved in any internal affairs of either ship which would be governed by foreign law.[4] They were American residents, hired to work exclusively on American docks as long-

---

[4] We put to one side situations in which the longshore work, although involving activities on an American dock, is carried out entirely by a ship's foreign crew, pursuant to foreign ship's articles.

shoremen, not as seamen on respondents' vessels. The critical inquiry then is whether the longshore activities of such American residents were within the "maritime operations of foreign-flag ships" which *McCulloch, Incres,* and *Benz* found to be beyond the scope of the Act.

We hold that their activities were not within these excluded operations. The American longshoremen's short-term, irregular and casual connection with the respective vessels plainly belied any involvement on their part with the ships' "internal discipline and order." Application of United States law to resolve a dispute over the wages paid the men for their longshore work, accordingly, would have threatened no interference in the internal affairs of foreign-flag ships likely to lead to conflict with foreign or international law. We therefore find that these longshore operations were in "commerce" within the meaning of § 2 (6), and thus might have been subject to the regulatory power of the National Labor Relations Board.[5]

The jurisdiction of the National Labor Relations Board is exclusive and pre-emptive as to activities that are "arguably subject" to regulation under § 7 or § 8 of the Act. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 245 (1959). The activities of petitioner in this case met that test. The union's peaceful primary

---

[5] The Board has reached the same conclusion in similar situations. See, *e. g., International Longshoremen's & Warehousemen's Union, Local 13,* 161 N. L. R. B. 451 (1966); *Marine Cooks & Stewards Union,* 156 N. L. R. B. 753 (1966); *New York Shipping Assn., Inc.,* 116 N. L. R. B. 1183 (1956). Cf. *Uravic* v. *Jarka Co.,* 282 U. S. 234 (1931).

Our conclusion makes it unnecessary to consider petitioner's further contention that in the absence of any evidence of an illegal objective, prohibition of peaceful picketing to publicize substandard wages deprived petitioner of freedom of speech in violation of the First and Fourteenth Amendments.

picketing to protest wage rates below established area standards arguably constituted protected activity under § 7. See *Steelworkers* v. *NLRB,* 376 U. S. 492, 498–499 (1964); *Garner* v. *Teamsters Union,* 346 U. S. 485, 499–500 (1953).

· *Reversed.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, concurring.

I agree with the majority that the Florida courts were in error in concluding that the National Labor Relations Act does not govern relations between the operators of foreign-flag vessels and the American longshoremen who work on such vessels while they are in American ports. However, I would not rest reversal on the conclusion that the union's conduct in this case was " 'arguably subject' to regulation under § 7 or § 8 of the Act." The union's picketing was clearly not proscribed by any part of § 8 of the Act. The only possible dispute could be over whether the picketing was activity protected by § 7 of the Act or whether the picketing was neither protected nor prohibited by the Act and therefore was subject to state regulation or prohibition. If the National Labor Relations Act provided an effective mechanism whereby an employer could obtain a determination from the National Labor Relations Board as to whether picketing is protected or unprotected, I would agree that the fact that picketing is "arguably" protected should require state courts to refrain from interfering in deference to the expertise and national uniformity of treatment offered by the NLRB. But an employer faced with "arguably protected" picketing is given by the present federal law no adequate means of obtaining an evaluation of the picketing by the NLRB. The employer may not himself seek a determination from the Board and is

left with the unsatisfactory remedy of using "self help" against the pickets to try to provoke the union to charge the employer with an unfair labor practice.

So long as employers are effectively denied determinations by the NLRB as to whether "arguably protected" picketing is actually protected except when an employer is willing to threaten or use force to deal with picketing, I would hold that only labor activity determined to be actually, rather than arguably, protected under federal law should be immune from state judicial control. To this extent *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), should be reconsidered. I concur in the Court's judgment in this case because in my view the record clearly indicates that the peaceful, nonobstructive picketing on the public docks near the ships was union activity protected under the National Labor Relations Act. See *Garner* v. *Teamsters Union,* 346 U. S. 485, 499–500 (1953).