**Louis V. BALDOVIN, Jr., Regional Director of Region 23 of the National Labor Relations Board, etc., Plaintiff-Appellant,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, et al., Defendants-Appellees.**

**Curtis L. MACK, Regional Director of Region 10 of the National Labor Relations Board, etc., Plaintiff-Appellee,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, et al, Defendants-Appellants.**

**Nos. 80–1174, 80–7174.**

United States Court of Appeals, Fifth Circuit.

Sept. 25, 1980.

---

1. *See, e. g., United States v. Salvucci,* —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), which abrogated the automatic standing rule.

Mandell & Wright, Sidney L. Ravkind, Houston, Tex., Thomas W. Gleason, Ernest L. Mathews, Jr., New York City, for International Longshoremen's Ass'n, Local No. 872.

Lee & Clark, Fred S. Clark, Savannah, Ga., for ILA Locals 1414 & 1423.

Wayne S. Bishop, Thomas P. Gies, Washington, D.C., for Occidental Chemical Co., amicus curiae.

Before RUBIN, HENDERSON and REAVLEY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

These cases pose the important question whether the prohibition of secondary boycotts in the Labor Management Relations Act bans the refusal by an American maritime union to work for a stevedore loading cargo destined for or originating in the Union of Soviet Socialist Republics based on the union's desire to voice a political protest and to avoid giving aid and comfort to a nation whose policies it considers inimical. Following Supreme Court decisions that hold a dispute between a union and a foreign entity not to be "in commerce" and, therefore, not prohibited by the LMRA, we affirm the decision of the District Court for the Southern District of Texas denying an injunction to the National Labor Relations Board and we vacate the injunction issued by the district court for the Southern District of Georgia.

Joseph E. Mayer, Washington, D.C., for Louis V. Baldovin and Curtis L. Mack.

Robert E. Williams, McGuiness & Williams, Washington, D.C., for American Farm Bureau Federation, et al., amicus curiae.

Bray & Watson, Houston, Tex., Seymour M. Waldman, New York City, James R. Watson, Jr., Houston, Tex., for International Longshoremen's Ass'n and S.A.G.C.D.

I.

The events giving rise to these controversies[1] are set forth in our opinion in *New*

1. This is a consolidated appeal. In *Baldovin v. International Longshoremen's Ass'n*, a Regional Director of the National Labor Relations Board (NLRB) appealed from an order of the District Court for the Southern District of Tex- as which denied an injunction under Section 10(*l*) of the National Labor Relations Act (NLRA) as amended by the Labor Management Relations Act (LMRA), 29 U.S.C. § 160(*l*). In *Mack v. International Longshoremen's Ass'n,*

# 448

*Orleans Steamship Ass'n v. General Longshore Workers, ILA, Local Union No. 1418,* 626 F.2d 455 (5 Cir. 1980). Because of its objection to the invasion of Afghanistan by the Soviet Union and in order to avoid enhancing the economic well-being of a nation it considers unfriendly, the International Longshoremen's Association (ILA) refused to load cargo aboard ships bound for the U.S.S.R. At the Port of Houston, ILA locals and their members refused to load a cargo of unembargoed corn produced in the United States aboard a ship destined for the Soviet Union. The ILA refusal to work occurred, of course, in the United States and has affected the farmers who produce grain, the transportation companies who move it to ports and the stevedores who load it aboard vessels.

The ILA concedes that it has no dispute with any person doing business at the Port of Houston and that its sole dispute is with the U.S.S.R. The Texas Farm Bureau, the Kansas Farm Bureau and the American Farm Bureau Federation each filed separate unfair labor practice charges with the National Labor Relations Board (NLRB) alleging that the ILA and its Houston locals were violating Section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act (NLRA) as amended by the Labor Management Relations Act (LMRA), 29 U.S.C. § 158(b) (4)(i) and (ii)(B), commonly known as the "secondary boycott" provisions. The Regional Director, Baldovin, investigated the charges, determined that there was reasonable cause to believe that the ILA and its locals were violating the Act as charged and that a complaint should issue, and, as required by Section 10(*l*) of the Act, 29 U.S.C. § 160(*l*), filed a petition for temporary injunctive relief pending the Board's final adjudication of the unfair labor prac-

tice charges. After a hearing, the petition was denied.[2]

Two ILA locals had agreements with shippers and stevedoring companies operating in the Port of Brunswick, Georgia, containing no-strike clauses. Local 1414 refused to supply workers to unload a shipment of anhydrous ammonia from Russia and Local 1423 refused to unload a load of potash from the U.S.S.R. Mack, the NLRB Regional Director for that area, sought an injunction against the ILA boycott in the Southern District of Georgia. Differing with the Texas District Court, that court issued a preliminary injunction.

## II.

■ Section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4), provides, in pertinent part, "[i]t shall be an unfair labor practice for a labor organization or its agents: (i) to engage in, . . . or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to . . . handle or work on any goods . . . or to perform any serices; . . . (ii) . . . where . . . an object thereof is: . . . (B) forcing or requiring any person . . . to cease doing business with any other person . . . ." These provisions implement the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *N.L.R.B. v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284, 1297 (1951). *See also National Woodwork Manufacturers*

---

the union appealed from an order of the District Court for the Southern District of Georgia, which granted an injunction under Section 10(*l*) enjoining the union from refusing to perform work in the Ports of Savannah and Brunswick, Georgia, on account of any grievance concerning the shipment of cargo to the Soviet Union.

**2.** The ILA's 1975 boycott of grain shipments to the U.S.S.R. was the subject of Section

8(b)(4)(ii)(B) charges, but the parties entered into a formal settlement agreement before the case reached the Board. Under the terms of the settlement, the ILA consented to this Court's entry of an order enforcing a cease and desist Board order against it. No. 76–2887, entered July 28, 1976 (unreported). The Board does not contend that the ILA's conduct here is contumacious of the outstanding order of this Court.

*Ass'n v. N.L.R.B.*, 386 U.S. 612, 620–627, 87 S.Ct. 1250, 1255–59, 18 L.Ed.2d 357, 364–368 (1967); *N.L.R.B. v. Local 825, Operating Engineers*, 400 U.S. 297, 302–303, 91 S.Ct. 402, 406–407, 27 L.Ed.2d 398, 404–405 (1971).

■ This section does not prohibit a union from taking traditional primary action against an employer, such as striking or picketing, in furtherance of a dispute with that employer. See *Local 761, Electrical, Radio & Machine Workers v. N.L.R.B.*, 366 U.S. 667, 672–674, 81 S.Ct. 1285, 1288–90, 6 L.Ed.2d 592, 596–598 (1961). However, it does prohibit a union from bringing pressure to bear against an employer with whom it has no dispute (a "secondary" or "neutral" employer) when one of the union's objectives is either to force that neutral employer to cease doing business with any other person or to cause some other person to cease doing business with the neutral employer. *Cf. NLRB v. Retail Store Employees Union,* —— U.S. ——, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980) (Section 8(b)(4)(ii)(B) forbids secondary picketing against a struck product when such picketing predictably encourages consumers to boycott completely a neutral party's business).

■ To paraphrase the Supreme Court's explanation of the primary-secondary dichotomy in *National Woodwork*, 386 U.S. at 644–645, 87 S.Ct. at 1268–69, 18 L.Ed.2d at 378, the "touchstone" is whether the union's concern is with the labor relations of the employer against whom its pressures are directed vis-a-vis its own employees (protected "primary" activity) or whether the activity is "tactically calculated to satisfy union objectives elsewhere" (prohibited "secondary" activity). *Accord, N.L.R.B. v. Enterprise Ass'n & General Pipefitters, Local 638*, 429 U.S. 507, 511, 97 S.Ct. 891, 894–95, 51 L.Ed.2d 1, 8 (1977).

All of the parties agree that the ILA does not seek to affect the labor relations of the employers with whom it has contracts or the terms and conditions of employment of their employees. The ILA's dispute is exclusively with the Soviet government which is the only authority capable of responding to its protest. The stevedoring, shipping, exporting or importing companies and all other persons doing business in the port of Houston and in other ports along the east and gulf coasts are completely neutral with regard to the ILA's dispute with the Soviet Union. The ILA boycott is, therefore, secondary within the meaning of the Act. It violates the purpose of the secondary boycott ban: to compel the union to confront the employer with whom it has its real or primary dispute pursuant to the usual procedures of the NLRA.

### III.

The secondary boycott provisions reach any activities aimed at individuals employed by a "person engaged in commerce or in an industry affecting commerce. . . ." NLRA Section 8(b)(4)(i)(B), as amended, 29 U.S.C. § 158(b)(4)(i)(B). These provisions buttress the general limitation of the NLRA, as amended by the LMRA, to activities "affecting commerce." NLRA Section 1, as amended, 29 U.S.C. § 151; NLRA Section 2(6) and (7), as amended, 29 U.S.C. § 152(6) and (7). The NLRB's jurisdiction over secondary boycotts is also confined to secondary activity "affecting commerce." NLRA Section 10(a), as amended, 29 U.S.C. § 160(a).

■ The direction of legislation toward activities affecting commerce arose from the constitutional provision authorizing Congress "to regulate Commerce . . . among the several States," U.S.Const. Art. I, § 8, cl. 3, and the implicit limitation of congressional power to the subjects delegated to it by the Constitution. The Congress lacks transcendent legislative authority with regard to labor relations as well as other matters. Its authority to prescribe labor-management ordinances derives from its power over interstate commerce. See *N.L.R.B. v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313–314, 9 L.Ed.2d 279, 281 (1963); *Guss v. Utah Labor Relations Board*, 353 U.S. 1, 3, 77 S.Ct. 598, 599, 1 L.Ed.2d 601, 603 (1957); *Consolidated Edison Co. of New York v. N.L.R.B.*,

305 U.S. 197, 222, 59 S.Ct. 206, 213, 83 L.Ed. 126, 136 (1938). While it may legislate about matters arising in or affecting interstate commerce, *see Alabama State Federation of Labor, Local No. 103 v. McAdory*, 325 U.S. 450, 464, 65 S.Ct. 1384, 1391, 89 L.Ed. 1725, 1736 (1945), it may not do so with regard to labor disputes that do not affect commerce. The terms "in commerce" and "affecting commerce" thus at once invoke the authority by which Congress acts and limit the scope of its enactments.

As we have seen, however, the secondary boycott prohibition was designed to narrow the labor controversy into a confrontation between the primary opponents. If one of those opponents is not subject to the NLRA, for example, because it is a foreign entity or a foreign nation, and if the objective of the union is to obtain concessions of a kind that could not be achieved either by domestic action or by labor disputes of the kind encompassed by the NLRA, the boycott ban would be merely a prohibition devoid of its function. Seeking to restore the secondary boycott provisions to their purpose, the Supreme Court has interpreted the commerce provisions in the statute to import two separate purposes: they set forth the basis for congressional action and the limitation on that action in accordance with constitutional concepts traditionally incorporated by those terms; in addition they limit the statutory scope of the secondary boycott provisions to those boycotts that could be remedied by domestic action.

The term "affecting commerce" or "in commerce" as used in the Act is obviously not self-defining in either context. *Windward Shipping Ltd. v. American Radio Association*, 415 U.S. 104, 112, 94 S.Ct. 959, 964, 39 L.Ed.2d 195, 201 (1974). However, the Supreme Court has offered guidance in a series of cases that delineate the meaning of the all-encompassing words "in commerce" as applied to boycotts remediable by domestic action.

In one of the earliest cases dealing with this problem, *Benz v. Compania Naviera Hidalgo*, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), the Court, without relying on the commerce concept, held that picketing by American unions in support of striking foreign crews engaged in a labor dispute with their foreign employers-shipowners was outside the coverage of the Act. Since the legislative history of the Act "inescapably describes the boundaries of the Act as including only the workingmen of our country and its possessions," 353 U.S. at 144, 77 S.Ct. at 703, 1 L.Ed.2d at 714, the Court found that Congress did not intend to allow the Act to be applied to a boycott protesting the treatment of foreign crews.

In *McCulloch v. Sociedad Nacional de Marineros*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), and *Incres Steamship Co., Ltd. v. International Maritime Workers Union*, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963), the Court reaffirmed the *Benz* reasoning, afforded jurisdictional content to the "affecting commerce" terminology in the Act and "concluded that maritime operations of foreign-flag ships employing alien seamen are not 'in commerce' within the meaning of [NLRA] § 2(6), 29 U.S.C § 152(6)." *Incres*, 372 U.S. at 27, 83 S.Ct. at 613, 9 L.Ed.2d at 559. The dispute in both cases involved the internal relationship of the foreign crew and the foreign-flag ship. Where the activity did not bear upon the labor relations aboard a foreign vessel, the *Benz* rationale was held inapplicable and coverage under the act was not denied. *Local 1355, International Longshoremen's Ass'n and Ocean Shipping Service, Ltd.*, 146 NLRB No. 100 (1964), *enf. denied on other grounds*, 332 F.2d 992 (4th Cir. 1964); *Madden v. Grain Elevator, Flour and Feed Mill Workers, ILA, Local 418*, 334 F.2d 1014 (7th Cir. 1964), *cert. denied*, 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560 (1965).

The *Benz* line of cases involved labor relations aboard foreign vessels. Sometime later, however, American unions picketed foreign ships to call attention to the competitive advantage enjoyed by those vessels because of the wage differences between foreign and domestic seamen. Whether these pickets were activities affecting commerce was considered in two 1974 opinions:

*Windward Shipping (London), Ltd. v. American Radio Ass'n*, 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974), and *American Radio Ass'n v. Mobile Steamship Ass'n*, 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974). In *Windward* the Court made it clear that the *Benz* line of cases did "not purport to fully delineate the threshold of interference with the maritime operations of foreign vessels which makes the LMRA inapplicable." 415 U.S. at 114, 94 S.Ct. at 965, 39 L.Ed.2d at 202.

Both the *Windward* and *Mobile* cases arose out of the same dispute. The ILA picketed against the loading of Liberian vessels because the wages paid non-American seamen aboard those vessels were "substandard to those of American seamen." *Windward*, 415 U.S. at 107, 94 S.Ct. at 961, 39 L.Ed.2d at 198. They disclaimed any dispute with other vessels or with anyone other than the foreign shipowner. The issue was whether the secondary boycott provisions of the LMRA preempted a state court's jurisdiction over a labor dispute. To determine whether the picketing activity "affected commerce" and thus was a secondary boycott within the reach of the LMRA, the Court looked to the objectives of the pickets [3] and the predictable responses of the foreign shipowners to the picketing activities. The Court concluded that the objective of the pickets was to force the foreign shipowner to raise his operating costs, thus interfering with the maritime operations of foreign vessels. Since "[v]irtually none of the predictable responses of a foreign shipowner to picketing of this type . . . would be limited to the sort of wage-cost decision benefiting American workingmen which the LMRA was designed to regulate," *Windward*, 415 U.S. at 115, 94 S.Ct. at 965, 39 L.Ed.2d at 202, the picketing was not "in commerce" as defined by this Act.

*Mobile* arose out of the same incident as *Windward*; however, the state court plaintiffs were not the foreign owners of the picketed ships, as they were in *Windward*, but were instead the stevedoring companies which sought to service the ship and a shipper who wished to have his crop loaded on it. The change in disputants was not sufficient to alter the result. The Court held that, where the primary dispute between the union and the foreign shipowners is beyond the Board's statutory authority, the effect of the union's picketing of the foreign vessels on the businesses of the United States stevedoring companies provides no basis for coverage under the Act. A bifurcated view of the term "commerce" to make it reach the American businesses affected by the primary dispute is not permitted. Whether the primary dispute is covered by the Act governs the Board's jurisdiction as to the incidental effects on the American stevedoring companies as well.

The *Windward* court distinguished an earlier decision, *International Longshoremen's Local 1416 v. Ariadne Shipping Co., Ltd.*, 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970), in which the Court held that picketing of foreign vessels to protest substandard wages paid by their owners to nonunion American longshoremen was "in commerce" within the meaning of the LMRA. The union activity in *Windward* was directed toward requiring foreign-flag vessels to raise substandard wages being paid to crews throughout the vessels' worldwide maritime operations. The union activity in *Ariadne* was directed toward requiring a foreign-flag vessel to hire unionized American workers, rather than nonunionized American workers, to service vessels berthed in American ports. "That the latter effect does not surpass 'the threshold of interference with the maritime operations

---

**3.** "At the very least, the pickets must have hoped to exert sufficient pressure so that foreign vessels would be forced to raise their operating costs to levels comparable to those of American shippers, either because of lost cargo resulting from the longshoremen's refusal to load or unload the vessels, or because of wage increases awarded as a virtual self-imposed tar- iff to regain entry to American ports. Such a large-scale increase in operating costs would have more than a negligible impact on the 'maritime operations' of these foreign ships, and the effect would be by no means limited to costs incurred while in American ports." 415 U.S. at 114, 94 S.Ct. at 965, 39 L.Ed.2d at 202.

of foreign vessels which makes the LMRA inapplicable', [*Windward*, 415 U.S. at 114, 94 S.Ct. at 965, 39 L.Ed.2d at 202] certainly provides no support for the proposition that the former effect also does not surpass that threshold." *Mobile*, 419 U.S. at 225 n.9, 95 S.Ct. at 415 n.9, 42 L.Ed.2d at 407 n.9.

The substandard wages protested by the pickets in *Ariadne* were being paid to American workers employed by the foreign ship "not to serve as members of its crew but rather to do casual longshore work," 397 U.S. at 199, 90 S.Ct. at 874, 25 L.Ed.2d at 222, *i. e.*, not aboard vessels but ashore, where domestic labor laws clearly applied. Unlike *Ariadne*, the protest in *Windward* "could not be accommodated by a wage decision on the part of the shipowners which would affect only wages paid within this country." 415 U.S. at 114, 94 S.Ct. at 965, 39 L.Ed.2d at 202.

The Board's recent decision in *National Maritime Union of America and Shippers Stevedoring Company*, 245 NLRB No. 29 (1979), is based on the *Windward-Mobile* rationale. In *Shippers Stevedoring* a union representing United States seamen picketed a U.S.S.R. flag ship with signs protesting the use of U.S.S.R. vessels, instead of United States ships, to transport foreign cargo purchased with United States tax dollars in violation of the Cargo Preference Act, 46 U.S.C. § 1241(b)(1). Because the picketing was aimed at replacing the foreign ship and its foreign crew with a United States ship and a United States crew, the Board viewed the picketing as directly affecting the "maritime operations" of the foreign ships. Therefore, the Board found the picketing activities to be not "in commerce" within the meaning of the LMRA.

The Board itself recognized in *Shippers Stevedoring* that the *Windward-Mobile* rationale cannot be confined to union efforts directed toward changing shipboard conditions of employment. The union that was picketing in *Shippers Stevedoring* could not be mollified by a change in shipboard wages or employment conditions, nor would a wage-cost adjustment by the shipowner end the dispute. The Board adopted as the touchstone for determining whether a particular activity affects commerce the foreignness of the objective of those engaged in the activity and the degree of intrusion into the affairs of the foreign entity which will be brought about by that entity's response to the activity in question.

The Regional Director contends that, whatever the ultimate object of the ILA's boycott may be, "an object" of the boycott is to force or require the stevedores to cease doing business with the Soviet Union in violation of Section 8(b)(4)(i)(ii)(B) of the Act. The ILA denies that it has any such purpose. The purpose of its members, the ILA asserts, is not themselves to engage in work that they consider unconscionable. The Regional Director responds that, under the Act, the criterion is not whether the ILA objective is reprobatory or, as he recites in his brief "respectable, or even admirable" but whether there is reasonable cause to believe that the means chosen by the union to accomplish its end is prohibited.

The ILA's objective in the instant case is to voice a political protest against the U.S.S.R. by refusing to handle cargo bound for that country. It has taken no steps to broaden that specific and limited objective. The parties have stipulated that the union has not refused to refer its members to the stevedoring companies to provide services for other cargoes. Even where the American entities have diverted ships from ports where the ILA work stoppage is effective to ports where it has been enjoined, the union has not struck those entities' non-Soviet operations despite the fact that such American entities are clearly doing business with the Russians and avoiding the ILA work stoppage.

While the ILA refusal to work has affected American farmers who produce the grain, American transportation companies who move it to ports and the American stevedores who load it aboard vessels, it is patent that this was an incidental effect and not the objective. As the *Mobile* case holds, a bifurcated view of such "commerce" is not permitted as regards the

American farmers and stevedores who are incidentally affected by the ILA's politically-inspired work stoppage. The effect of the ILA action on the business of these American entities provides no "basis for Board jurisdiction where the primary dispute is beyond its *statutory* authority . . ." 419 U.S. at 226, 95 S.Ct. at 416, 42 L.Ed.2d at 408 (emphasis in original).

These union activities, a political protest against the political actions of a foreign government, in comparison with the union activities in *Windward* and *Mobile*, are even further removed from the type of domestic labor relations that the Act was intended to cover. *Windward* and *Mobile* cannot be distinguished on the basis of the purely factual differences that the unions were there conducting "area standards" picketing directly against the foreign ships, the unions had a primary labor dispute with the foreign ships and the picketing of the vessels was designed to affect directly the internal labor relations of the foreign ships vis-a-vis their foreign crews.[4]

In *Windward* as here the union objective was to compel a foreign entity to change a

course of action it was taking away from our shores. If the fact that the present dispute is with a foreign government over military policy makes the activity in commerce, while a dispute with a foreign employer over its labor policy would not be in commerce, then the anomalous result would be that an injunction could not issue when labor relations are involved but could issue when they are not.

■ The mere fact that a boycott or picketing is aimed at a foreign entity does not, of course *ipso facto* preclude NLRB jurisdiction.[5] The object of the dispute determines whether or not it is "in commerce." When the dispute is over the hiring of American labor in United States ports, it is "in commerce." When the dispute is over the foreign vessels' relations with its foreign employees, it is not "in commerce." When the dispute is over a foreign government's invasion of a remote nation, it is more emphatically not "in commerce."

■ As in *Windward* and *Mobile*, the ILA's activities are outside the coverage of

---

**4.** Picketing to protest an employer's payment of wages and benefits below the established "area standards" is in furtherance of a primary dispute with the picketed employer. *Cf. San Francisco Local Joint Executive Board of Culinary Workers v. N.L.R.B.*, 501 F.2d 794 (D.C. Cir.1974) (area standard picket and § 8(b)(7) of NLRA, 29 U.S.C. § 158(b)(7)); *Centralia Building & Construction Trades Council v. N.L.R.B.*, 363 F.2d 699 (D.C.Cir.1966) (area standard picket and § 8(b)(7) of NLRA, 29 U.S.C. § 158(b)(7)); *Claude Everett Construction Co.*, 136 NLRB No. 28 (1962) (area standard picket and § 8(b)(7) of NLRA, 29 U.S.C. § 158(b)(7)); *Calumet Contractors Association*, 133 NLRB No. 57 (1961). (area standard picket and § 8(b)(4) of NLRA, 29 U.S.C. § 158(b)(4))

**5.** The Court in *Mobile* specifically approved those cases holding that the Board has jurisdiction under Section 8(b)(4) of secondary activities directed at domestic conditions even though the primary employer is a foreign entity. 419 U.S. at 225, n.10, 95 S.Ct. at 415, n.10. *See Madden v. Grain Elevator, Flour and Feed Mill Workers, International Longshoremen Association, Local 418*, 334 F.2d 1014 (7th Cir. 1964), *cert. denied*, 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560 (1965); *Grain Elevator, Flour and Feed Mill Workers, International Longshoremen Association, Local 418 v. NLRB,*

376 F.2d 774 (D.C.Cir. 1967), *cert. denied,* 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967). In the *Grain Elevator* cases a Canadian union's labor dispute with a Canadian shipper resulted in a secondary boycott in this country, directed against an American employer by an American union and involving employees working in a domestic plant of the American employer. Although the primary dispute between the two foreign entities was not within the NLRB's jurisdiction, the secondary boycott was held to "affect commerce" and thus to be within the jurisdiction of the Board. The American union's objective was to prevent the American employer from doing business with the Canadian shipper and thus to embroil the American employer in the foreign labor dispute. The objective was to influence action in the United States, not abroad. The union activity was designed to affect directly the American employees in their relationship with their American employer, thus bringing the *Grain Elevator* cases more closely in line with *Ariadne*, where the Act was applicable, than with *Windward*, where the Act was inapplicable. While we think that the *Grain Elevator* cases are distinguishable from the present cases, the distinction is solely one of degree and we cannot say that a bright line can be drawn between them and the present cases.

the Act because of the nature of the reasonable responses that would accommodate the union's complaint. Only a political decision on the part of a foreign government can satisfy the ILA's grievance. Thus, the *Windward* rationale as recognized by the Board in *Shippers Stevedoring* compels a finding that the ILA activities do not come within the coverage of the Act.[6]

### IV.

When the NLRB Director seeks a Section 10($l$) injunction, the function of the District Court is not to determine whether an unfair labor practice has in fact been committed, but simply to determine whether there is reasonable cause to believe that a violation of the Act has occurred. *Solien v. United Steelworkers*, 593 F.2d 82 (8th Cir.), *cert. denied*, 444 U.S. 828, 100 S.Ct. 54, 62 L.Ed.2d 36 (1979). See *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 787, n.7 (5th Cir. 1973) (a Section 10(j) injunction). The "reasonable cause" standard is satisfied where there is a reasonable basis upon which the NLRB would be able to sustain its charge before the Board. Even where the Director's legal theories are "novel" or "untested" the district court may appropriately order the injunction where equitably proper and where necessary to preserve the Board's jurisdiction. *See Boire*, 479 F.2d at 789 (5th Cir. 1973).

In the present cases, there was no reasonable basis to believe that the ILA activities complained of "affected commerce." The facts were largely undisputed. The union's objective was openly professed and unambiguous. The only question was whether, as a matter of law, the Act extended to such activities. The jurisprudence precluded the reasonableness of a belief that it did.

In view of the decision we have reached, we need not consider whether, as urged by the ILA, its conduct and the conduct of its members is protected by the first amendment.

The Supreme Court decisions whose lead we follow were reached by divided courts but they read the LMRA as drawing a domestic-foreign impact line that permits domestic unions to boycott foreign vessels with the purpose of attempting to affect foreign affairs. We attempt but to interpret the congressional intent. If we fail to recognize it, the remedy lies in the hands of Congress.

The judgment of the District Court for the Southern District of Texas in *Baldovin v. ILA*, No. 80–1174, is AFFIRMED. The judgment of the District Court for the Southern District of Georgia in *Mack v. ILA*, No. 80–7174, is REVERSED and the injunction is VACATED. The cases are remanded for further proceedings consistent with this opinion.

---

**6.** The NLRB attempts to support its claim that political disputes can come within the Board's jurisdiction over secondary boycotts by relying on this court's footnote in *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236 (5th Cir. 1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). In that case the mine workers strike was "in the nature of a political strike, . . . not aimed at United States Steel at all, but rather at the national policy of this country's permitting the importation of South African coal." 519 F.2d at 1247. We observed in a footnote that this case was argued on a *Boys Markets* theory and

that "United States Steel has a remedy for a secondary boycott through an NLRB § 10($l$) injunction, 29 U.S.C. § 160(j) . . . *See* NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4) . . . ." 519 F.2d at 1247 n.23. The observation does not amount to a conclusion that the union's activity would be found to constitute a secondary boycott within the Act; it merely refers to the remedies available if such a secondary boycott did exist. We read no more into it. If there are intimations of a conclusion that the facts give rise to a secondary boycott, these overtones are purely dicta.