John R. PATTERSON, et al., Plaintiffs,

v.

NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, et al., Defendants.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, et al., Defendants.

In the Matter of the Complaint issued by the Interim Administrator that MAGAZINE DISTRIBUTORS, INC. and MDI Distributors, Limited Partnership, the successor in interest of Imperial News Company, Inc., who are in violation of the terms of the Settlement Agreement pursuant to *Patterson, et al. v. N.M.D.U., et al.*, 73 Civ. 3058 (WCC) and 73 Civ. 4278 (WCC), U.S.D.C., S.D.N.Y.

Nos. 73 Civ. 3058 (WCC), 73 Civ. 4278 (WCC).

Claim No. 274.

United States District Court, S.D. New York.

June 5, 1992.

See also, 138 B.R. 149.

James L. Lee, Regional Atty., Anna M. Stathis, Supervisory Trial Atty., Michael J. O'Brien, Trial Atty., E.E.O.C., New York City, for E.E.O.C.

O'Connor & Mangan, P.C., Long Island City, N.Y. (J. Kenneth O'Connor, of counsel), for Newspaper and Mail Deliverers' Union.

Miller & Bush, New York City (Irving T. Bush, of counsel), for Local 917 of Intern.

Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO.

Townley & Updike, New York City (Christopher A. D'Angelo, of counsel) for Magazine Distributors, Inc. and MDI Distributors, Ltd. Partnership.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

A class of private plaintiffs and the Equal Employment Opportunity Commission ("EEOC") brought two civil rights actions in 1973 against the Newspaper and Mail Deliverers' Union of New York and Vicinity ("NMDU" or "Union") and more than fifty news publishers and distributors within the Union's jurisdiction. Both suits charged that the Union, with the acquiescence of the publishers and distributors, had historically discriminated against minorities, and that the structure of the collective bargaining agreement, combined with nepotism and cronyism, had perpetuated the effects of past discrimination in violation of Title VII of the Civil Rights Act of 1964. Each lawsuit sought an affirmative action program designed to achieve for minorities the status they would have had in the newspaper delivery industry but for the alleged discriminatory practices.

On September 19, 1974, then-District Judge Lawrence W. Pierce issued an Opinion and Order approving a settlement between the parties and incorporating the Settlement Agreement in a Consent Decree, familiarity with which is presumed. *See Patterson v. Newspaper and Mail Deliverers' Union,* 384 F.Supp. 585 (S.D.N.Y. 1974) *aff'd,* 514 F.2d 767 (2d Cir.1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). The Settlement Agreement implements an affirmative action program which modifies the hiring procedures for newspaper deliverers under the industry-wide collective bargaining agreement. Under the Consent Decree, each employer maintains a work force of regular situation holders for its minimum delivery needs. To accommodate fluctuations in circulation, the publishers are permitted to supplement their work force with daily shapers.

The daily shapers are divided into three groups with descending hiring priorities. Those shapers on the Group I list have first priority, after the regular situation holders, in order of their shop seniority. The next priority belongs to Group II shapers. Group II consists of all persons holding regular situations or Group I positions with other employers in the industry. Last in order of priority are the Group III shapers.

The Settlement Agreement also established an Administrator, appointed by the Court, to implement the provisions of the Consent Decree and supervise its performance. The Consent Decree authorizes the Administrator to hear claims concerning violations of the Decree. Appeals from his decisions are heard in this Court.

Pursuant to the Settlement Agreement, defendants Magazine Distributors, Inc. ("MDI") and MDI Distributors, Limited Partnership (the "Partnership") seek review of a determination by Administrator William S. Ellis, Esq. (the "Administrator"), denominated "Claim 274." The Court has reviewed the memoranda and exhibits relied upon by the Administrator, as well as the arguments submitted to this Court by the parties. For the reasons set forth below, the Administrator's decision is affirmed.

## BACKGROUND

Imperial News Co. ("Imperial"), a wholesale distributor of magazines and paperback books for markets in Nassau, Suffolk, lower Westchester and in parts of Fairfield County, Connecticut, was a party defendant in *Patterson* and a signatory to the Settlement Agreement. For many years, Imperial conducted its business out of a facility in Melville, New York. NMDU represented some, but not all, of the drivers and warehouse employees at Imperial. Of its 96 NMDU-represented employees, 19 (or 19.8% of the total) were minorities.

MDI is a Connecticut-based wholesale distributor of newspapers and periodicals and has been in business for over thirty years. Unlike Imperial, MDI is neither a party defendant in *Patterson* nor a signatory to the Settlement Agreement. Prior to December 1990, MDI operated exclusively out of Connecticut and competed with Imperial in Long Island from its Connecticut base.

In November 1990, Local 917 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO ("Local 917"), was recognized as the exclusive bargaining representative of MDI's drivers and warehousemen based in Plainville, Connecticut. The MDI–Local 917 collective bargaining agreement contained an "accretion" clause, wherein MDI agreed that if it expanded its business or opened a new facility, MDI employees at the new locations would be covered by Local 917. Also in November 1990, MDI leased a site in Hicksville, New York. In December 1990, MDI hired drivers for its Hicksville site, and recognized Local 917 as its bargaining representative.

On January 23, 1991, Imperial terminated all of its employees and ceased operations. On March 8, 1991, Imperial and the Partnership entered into an asset purchase agreement (the "Purchase Agreement"), with the latter purchasing substantially all of Imperial's assets. Paragraph 1.1 of the Purchase Agreement provided, *inter alia*, that:

> MDI shall purchase from Imperial, the following assets of Imperial ... subject to the MNC Lien, but otherwise free and clear of any liabilities and obligations with respect thereto, whether absolute, contingent or otherwise, and free and clear of all liens, claims, judgments, pledges, mortgages, options, interests, or other encumbrances of any kind[.]

Paragraph 1.3 of the Purchase Agreement provided that MDI would not assume any liability for, *inter alia*, Imperial's employment agreements, collective bargaining agreements, or other labor-related liabilities or obligations. The Purchase Agreement was conditioned on Imperial commencing a voluntary bankruptcy proceeding and on the entry of a Bankruptcy Court order approving the Purchase Agreement.

On April 24, 1991, Imperial filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* On June 13, 1991, the NMDU filed objections to the sale, claiming that Imperial's sale of its assets to the Partnership was not an arms-length transaction. At the conclusion of a hearing held on July 2, 1991, Judge Conrad approved the sale in accordance with the terms and conditions set forth in the Purchase Agreement. In so doing, the Bankruptcy Court stated:

> The sale is approved. The court makes the specific finding that based upon the evidence which is before the court, that this is in the best interests of the debtor. This is an arms-length transaction....

In addition, the Bankruptcy Court Order dated July 7, 1991 provided that:

> any such claim of right, title, interest, lien or encumbrance not having been asserted in the manner set forth in the Application and Notice are hereby deemed waived and MDI shall take title to the Assets discharged, released and exonerated from such claims of right, title, interest, lien or encumbrance of all parties other than MNC....

The Union applied for an order to stay the sale to the Partnership pending appeal of the Bankruptcy Court's Order. That application was denied by Judge Whitman Knapp of this Court on July 24, 1991. Subsequently, the NMDU appealed the Bankruptcy Court's approval of the sale, which appeal was dismissed as moot by Judge John S. Martin, Jr. of this Court on November 12, 1991. The Second Circuit summarily affirmed that dismissal on May 8, 1992.

In addition, the Union filed in August 1991 with the National Labor Relations Board (the "NLRB") an amended unfair labor charge, claiming that MDI was a "successor" to Imperial, rather than its alter ego, and that MDI has maintained a "discriminatory policy" toward individuals who "had been represented by" NMDU. In a decision dated November 26, 1991, the NLRB declined to issue a complaint on the ground that the evidence adduced failed to establish that MDI and the Partnership unlawfully refused to provide work opportunities to Imperial employees based on union affiliation[1] or that MDI's Hicksville facility is a successor to Imperial's operations.

The present appeal arises out of a claim filed with the Administrator by the NMDU, dated July 17, 1991, that MDI and the Partnership "violated" and "frustrated" the purpose and intent of the Settlement Agreement and Consent Decree by "not offering employment to the Imperial NMDU bargaining unit members" at MDI's facility in Hicksville, New York. MDI[2] opposed the Administrator's authority to consider the claim on jurisdictional grounds, and on September 12, 1991, this Court directed the Administrator to hold a limited proceeding to consider the jurisdictional issue only. On March 26, 1992, the Administrator issued a Determination, in which he concluded that he had jurisdiction to review the NMDU's claim. MDI has appealed that Determination to the Court.[3]

## DISCUSSION

The Settlement Agreement provides the Administrator with broad authority to take all actions he deems necessary to implement the provisions and to ensure the performance of the Order. It further provides that the Administrator shall hear and determine a wide variety of claims arising under the Agreement, which may then be brought before the Court for review. Settlement Agreement ¶ 4.

■ In *Foreman v. Wood, Wire & Metal Lathers Int'l Union, Local No. 46,* 557 F.2d 988, 992 (2d Cir.1977), the Second Cir-

---

1. The NLRB excepted from its holding the claims of four individuals who may have been subject to discrimination based upon their union membership.

2. Hereinafter, all references to MDI include both MDI and the Partnership.

3. The NMDU has submitted no brief to this Court in support of the Administrator's Determination; however, the NMDU did appear before this Court at a conference held on June 1, 1992 to articulate its views regarding the appeal.

cuit noted that the scope of review of an independent administrator appointed to ensure compliance with a settlement decree was similar to that applied to an arbitrator's decision. More recently in *United States v. Int'l Brotherhood of Teamsters,* 905 F.2d 610, 616 (2d Cir.1990), the Court of Appeals reiterated that an administrator's decision is "entitled to great deference." Thus, it is clear that an administrator's decision cannot be rejected merely because a court may be inclined to reach a different result.

◼ MDI challenges the Administrator's determination that he has jurisdiction to consider the NMDU's claim. MDI and Local 917[4] argue that the instant claim is beyond the scope of the Settlement Agreement since it charges only that MDI engaged in discrimination against NMDU–represented Imperial employees by refusing to hire them. MDI insists that the Consent Decree contemplates that in order to assert a violation thereof, one must allege discrimination based on race, color, or national origin.

◼ While MDI is correct that claims of pure union discrimination are not covered by the terms of the Settlement Agreement and Consent Decree, the Court believes that the Union has asserted a claim cognizable by the Administrator—namely, that MDI knowingly entered into an agreement to purchase the assets of Imperial with the express purpose of aiding Imperial

in avoiding its affirmative obligations under the Consent Decree. In its brief before the Administrator, the Union alleged that the owner of Imperial at the time its operations were subject to the Consent Decree, Ronald Scherer, presently holds a 48% interest in MDI.[5] Moreover, the NMDU alleged that on January 23, 1991, almost five months before the execution and delivery to MDI of the bill of sale for the greater part of Imperial's assets, and six weeks before MDI got title to the trucks and cars, MDI closed down Imperial's plant at Melville and removed all of the inventory and other assets, including the trucks and cars, to its Hicksville facility. The NMDU argues that such facts, among others, indicate that the sale of assets by Imperial to MDI was not a good faith, arms-length transaction entered into for a valid business purpose, but instead a cosmetic transaction entered into with the express purpose of avoiding the obligations imposed by the terms of the Consent Decree.

The Administrator has jurisdiction to hold an evidentiary hearing to determine whether MDI acted in concert with Cohen and Scherer to create the appearance of a *bona fide* sale of Imperial's assets in an attempt to circumvent the Consent Decree. Contrary to the assertions of MDI, the Administrator's power is not conditioned upon there being a specific allegation of race discrimination. Paragraph 4 of the Settlement Agreement provides:

**4.** The Administrator granted Local 917's application to intervene in the proceedings before him for the purpose of representing itself and its member drivers and warehouse workers at MDI's Hicksville facility. As an intervenor, Local 917 supported MDI's motion to dismiss the NMDU's claim. Local 917 asks this Court for permission to intervene in the instant matter and submit a brief in support of MDI's motion to vacate the Administrator's Determination and dismiss the NMDU's claim. None of the parties opposes this request.

Local 917 requests permissive intervention pursuant to Rule 24(b)(2), Fed.R.Civ.P., or intervention as of right under Rule 24(a)(2), Fed.R.Civ.P. Since the Court concludes that permissive intervention should be allowed, there is no need to discuss whether the applicant has satisfied the requirements for finding intervention as of right. Rule 24(b)(2) provides that upon

timely application, anyone may be permitted to intervene in an action "when an applicant's claim or defense and the main action have a question of law or fact in common." The Second Circuit has noted that "Rule 24(b) necessarily vests broad discretion in the district court to determine the fairest and most efficient method of handling a case with multiple parties and claims." *SEC v. Everest Management Corp.,* 475 F.2d 1236, 1240 (2d Cir.1972). There is no doubt that the assertions of Local 917 herein present questions of law and fact common to NMDU's claim. Moreover, it appears that Local 917's intervention will not unduly delay or prejudice the adjudication of the rights of the original parties to the action. Accordingly, Local 917's motion to intervene in this proceeding is granted.

**5.** Robert B. Cohen is alleged to hold a 52% interest in MDI.

In addition to the powers specified herein, the Administrator shall be empowered to take all actions (including the establishment of such additional recordkeeping and the employment of such mediators and fact finders) as he deems necessary to implement the provisions and to ensure the performance of the Order. Certainly, the broad language of this provision empowers the Administrator to see to it that the obligations of the Consent Decree are not skirted via a phony sale of assets to a company that was neither a party defendant in *Patterson* nor a signatory to the Decree.

■ MDI cites cases such as *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473, *reh'g denied*, 404 U.S. 874, 92 S.Ct. 24, 30 L.Ed.2d 120 (1971) and *International Longshoremen's Ass'n v. Ariadne Shipping Co.*, 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970) for the proposition that this claim is a union-animus claim over which the NLRB has exclusive jurisdiction. These cases are inapposite. The Court does not doubt that the NLRB is the proper forum to consider the NMDU's claim that MDI discriminated on the basis of union membership. However, as the Court has already noted, the NMDU's claim charges not only union discrimination, but also an attempt to avoid the obligations of the Consent Decree by means of a contrived sale of assets. The policy behind NLRB pre-emption—the avoidance of conflicting regulation of conduct by entrusting the development of a national, common labor law to a centralized, expert agency, *see Lockridge*, 403 U.S. at 286–88, 91 S.Ct. at 1917–18—would not be furthered by submitting the latter claim to the NLRB. In view of his substantial experience and familiarity with the *Patterson* matter, it is the Administrator, not the NLRB, who is best equipped to consider a claim charging a violation of the Consent Decree.[6]

■ Nor does the Court agree with MDI that the NLRB and the Bankruptcy Court both necessarily determined that the sale was in good faith. The matter of the Consent Decree and Settlement Agreement were never raised in either proceeding. The NLRB's conclusion that Imperial's assets were sold "in a bona-fide arms-length transaction" was reached in the context of deciding whether the sale was made with the objective of ridding Imperial of the NMDU. Similarly, the Bankruptcy Court's conclusion with respect to the asset sale was reached in the context of deciding whether the sale was in the best interests of the debtor. In the instant action, the Court is concerned only with the issue of whether the transaction entered into by

6. MDI argues that the Administrator is precluded from considering the issue of whether MDI is a successor to Imperial since the NLRB has already decided that issue in the negative. The Court cannot agree. In its decision dated November 26, 1991, the NLRB emphasized that an essential element in establishing that MDI is the legal successor to Imperial is continuity in work force, or a discriminatory refusal by the alleged successor to hire a majority of the predecessor's employees. The NLRB concluded that although the evidence tended to show that MDI did not hire a majority of its employees from among the NMDU–represented employees of Imperial, consideration of the issue of the hiring of MDI's initial work force was barred as untimely. In any event, the NLRB noted that there was insufficient evidence to show that MDI engaged in discrimination against NMDU–represented Imperial employees by refusing to hire them. Instead, the Board concluded that the evidence tended to show that Imperial employees did not apply for positions with MDI even though they were aware that hiring was occurring. More-

over, it noted that among MDI's initial hires were a number of NMDU members who were at the time on strike against the New York Daily News.

Certainly, the determination of the NLRB regarding the issue of successorship is entitled to substantial weight if and when the Administrator finds that it is necessary to actually consider the question of successorship. However, the NLRB's conclusion is not entitled to preclusive effect. The Board was not presented with the issue of whether the Consent Decree, obtained by the EEOC for the purpose of enforcing Title VII, should apply to MDI. That issue may involve policy considerations not contemplated in the analysis of the NLRB.

Nor does the Court agree with MDI that the prior bankruptcy proceedings necessarily resolved the issue of successorship. While the Bankruptcy Court did order that the Partnership's purchase of Imperial's assets be "free and clear of any claims, liens and encumbrances," it never addressed the issue of successorship.

Imperial and MDI was motivated by a desire to circumvent the Consent Decree. That issue was not raised before the NLRB or the Bankruptcy Court. Accordingly, the Administrator is not bound by the determinations of either tribunal and may properly consider whether the sale of assets to MDI was a good-faith, arms-length transaction.[7]

## CONCLUSION

For the foregoing reasons, the Administrator's decision is affirmed. The matter may proceed to a hearing before the Administrator to determine whether Imperial's sale of assets to MDI was made with the purpose of circumventing the Consent Decree.

---

**7.** In addition, MDI argues that the Settlement Agreement cannot be enforced against MDI or the Partnership since neither were parties to the agreement. MDI's argument is unpersuasive. As the 9th Circuit has noted:

> [Defendant] also asserts that no consent decree may be enforced against a successor employer where the successor employer is not a party to the decree. That the new employer is not a party to the consent decree is of course irrelevant, for that is the whole point of the successorship doctrine. The question is whether the successorship doctrine applies and, if so, on what rationale.

*Bates v. Pacific Maritime Ass'n,* 744 F.2d 705, 709 (9th Cir.1984).