NEW ORLEANS STEAMSHIP ASSOCIA-
TION, a corporation, and TTT Steve-
dores of Louisiana, Inc., a corporation,
Plaintiffs-Appellees,

v.

GENERAL LONGSHORE WORKERS,
ILA Local Union No. 1418, etc., et
al., Defendants-Appellants.

JACKSONVILLE BULK TERMINALS,
INC., Hooker Chemical Corporation and
Occidential Petroleum Company, Plain-
tiffs-Appellees,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, Local Union 1408, In-
ternational Longshoremen's Associa-
tion, et al., Defendants-Appellants.

Nos. 80–3111, 80–5089.

United States Court of Appeals,
Fifth Circuit.

Sept. 25, 1980.

456

Thomas W. Gleason, Andre Mazzola Mardon, Ernest L. Mathews, Jr., Gary G. Nicolosi, New York City, for Internat'l. Longshoreman's Assoc. AFL–CIO.

Mahon, Mahon & Farley, Lacy Mahon, Jr., Jacksonville, Fla., for Local 1408 and Members & Individual defendants-appellants.

Seyfarth, Shaw, Fairweather & Geraldson, Thomas P. Gies, Wayne S. Bishop, Washington, D. C., Kent, Watts, Durden, Kent & Mickler, Frederick H. Kent, Jacksonville, Fla., Wofford H. Stidham, Tampa, Fla., for plaintiffs-appellees in 80–3111.

Hess & Washofsky, Dennis M. Angelico, New Orleans, La., for all other defendants-appellants.

Monroe & Lemann, David E. Walker, Andrew P. Carter, Alvin J. Bordelong, Jr., New Orleans, La., for plaintiffs-appellees in 80–5089.

Before RUBIN, HENDERSON and REAVLEY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Unions and their members expressed their political views by refusing to load cargo aboard ships bound for a foreign nation whose actions they wished to condemn. Each union had a collective bargaining agreement with an American firm forbidding work stoppages and requiring the arbitration of disputes. Following the national labor policy determined by Congress, we conclude that a federal district court may by injunction enforce an arbitration award holding such a work stoppage invalid as violating the collective bargaining agreement but that it may not enjoin the union's action pending arbitration or extend an arbitrator's decree to apply to future cases no matter how similar they may appear likely to be. We also conclude that such an injunction does not violate the first amendment rights of the union and its members or impose involuntary servitude on them.

I.

On January 4, 1980, the President of the United States stated that, because of the Soviet Union's invasion of Afghanistan, he had decided "to halt or reduce exports" of grain to the Soviet Union. Pursuant to the authority given him by the Export Administration Act, 50 U.S.C.App. § 2401, et seq. (1979), he later issued directives that implemented an embargo against grain shipments to the Soviet Union, but he excluded from it the outstanding amount of unshipped grain committed under a 1975 agreement between the United States and the Soviet Union on the supply of grain. Imports were not affected.

Shortly thereafter, in his own response to the invasion of Afghanistan by the Soviet

Union and what he perceived as a threat to world peace and the security of the United States, the International President of the International Longshoremen's Association (ILA), Thomas U. Gleason, announced that he was instructing all ILA local unions on the Atlantic and Gulf Coasts to boycott all shipments to the Soviet Union of any materials including grain. The ILA also adopted a resolution that its members would not handle any cargo bound to or coming from the Soviet Union. The ILA boycott was, therefore, broader than the Presidential directive and prevented not only the loading of grain and other cargo licensed for export and exempted from or not covered by the Presidential embargo but also the unloading of cargo arriving from Russia. The resolution was adopted to express the conscience of union workers against contributing to the economic or military well-being of a nation that they considered a serious threat to their own country. It was not motivated by any hope for economic gain or by any dispute with any employer members, but was purely a political protest. No action was sought from the employers of union members and nothing that these employers might do could have eliminated the cause of the boycott.

The motor vessel JULIA L arrived at the Continental Grain elevator in Westwego, Louisiana, which is near New Orleans, in the latter part of January. Continental obtained an export license from the Department of Commerce for 177,000 bushels of corn to be shipped to Russia. Continental then hired TTT Stevedores to load the corn upon the M/V JULIA L. TTT Stevedores and a number of other firms who employ longshoremen are members of the New Orleans Steamship Association (NOSSA) and are parties to the collective bargaining agreements between NOSSA and the several ILA locals whose members work in the Port of New Orleans.

On January 23, TTT Stevedores attempted to hire the necessary gang under the terms of the 1977–80 Deep-Sea Agreement between NOSSA and Longshore Workers ILA Local Unions Nos. 1418 and 1419; a clerk under the terms of a separate 1977–80 Agreement between NOSSA and Clerks and Checkers Local No. 1497 of the ILA; and a waterboy under the terms of yet another contract, the 1977–80 Deep-Sea Agreement between NOSSA and the Sack-Sewers, Sweepers, Waterboys and Coopers Union, ILA Locals No. 1683 and 1802. Each of the ILA locals refused to load grain aboard the JULIA L because the vessel was bound for the Soviet Union.

Each of the three collective bargaining agreements contains an identical no-strike clause and each contains a clause, identical in substance, requiring that all contractual grievances and disputes be submitted to arbitration.[1] Therefore, NOSSA and TTT Stevedores invoked procedures for expedited arbitration under each of the three collective bargaining agreements, charging that the work stoppage on the M/V JULIA L violated the unions' "no-strike" commitment. Three separate arbitration proceedings were convened. The grieving parties demanded "cease and desist" orders from each of the three arbitrators directing that the local unions:

> ". . . cease and desist from engaging in any strike or work stoppage in connection with the loading or unloading of cargo aboard the motor vessel JULIA

---

1. In pertinent part, the language is as follows:
   "(a) *No Strikes—No Lockouts*
   There shall be no strikes, work stoppages, nor shall there be any lockouts.
   (b) *Disputes Procedure and Arbitration*
   The parties accept the principle that any dispute involving the interpretation or application of the terms of this agreement shall be resolved in an orderly and expeditious manner. They commit themselves to the procedure outlined below . . . and failure to deal with disputes under the disputes proce-

dure shall constitute a violation of this agreement.
(c) These steps shall be followed to insure prompt resolution of disputes.

    .    .    .    .    .

The arbitrator's authority shall be limited to interpretation and application of the terms of this agreement . . . . The arbitrator shall have no authority to render decisions which have the effect of adding to, subtracting from, or otherwise modifying the terms of this Agreement."

L at the Westwego Continental Grain Elevator, *or from engaging in any other strikes or work stoppages in connection with loading or unloading Russian vessels and/or Russian cargo . . . .*" (Emphasis added.)

Following an initial postponement of two days at the unions' request, a separate arbitration hearing under each agreement was held on January 26, 1980, one by Arbitrator John F. Caraway, another by Arbitrator John J. Maxwell and the third by Arbitrator John J. McAulay. The unions did not participate in the hearings except to make an initial appearance for the purpose of submitting a written statement to the arbitrators. NOSSA and TTT Stevedores submitted evidence at each hearing.

Each arbitrator issued a separate award. Each of them found that the ILA boycott of exempt Russian grain violated the no-strike clause in each contract. Each arbitrator issued a "cease and desist" order, but the orders differed in their terms.

The arbitrator appointed under NOSSA's Deep-Sea agreement with the Sack-Sewers, John J. McAulay, made his order applicable to ". . . any work stoppage in violation of the Deep-Sea contract . . . with reference to grain or other cargo having a U.S. Export License . . . ." The arbitrator appointed under the General Longshore Workers Agreement, John F. Caraway, and the arbitrator appointed under the Clerks Agreement, John J. Maxwell, required the locals involved only to cease from strikes and work stoppages in connection with the loading or unloading of exempt grain aboard the JULIA L.

When the various ILA locals continued to refuse to load grain aboard the JULIA L, NOSSA and TTT Stevedores sought an injunction to enforce the arbitration awards. Following the conclusion of a hearing the district judge ordered that the arbitration awards be enforced and that the defendants be preliminarily enjoined from engaging in, inducing or in any way encouraging any work stoppage in connection with the loading or unloading of grain destined for the Soviet Union under U.S. Export License. Thus the order went beyond the terms of the awards made by Arbitrators Caraway and Maxwell.

The Jacksonville Bulk Terminals (JBT) suit arises out of the same international events. Members of Local 1408, ILA, are employed by JBT which maintains a bulk marine shipping terminal in the Port of Jacksonville, Florida. JBT is a party to the collective bargaining agreement between the Jacksonville Maritime Association and Locals 1408, 1408–A, and 1593 of the ILA.

JBT is engaged in the loading of superphosphoric acid (SPA) onto ships destined for the Soviet Union from the Port of Jacksonville. SPA was not included in the Presidential embargo of January 4.

On January 15, 1980, a Norwegian vessel entered the Jacksonville port to take on SPA for transport to the Soviet Union. Pursuant to the national ILA resolution, the members of Local 1408 refused to handle the cargo. At no time did Local 1408 refuse to handle any other cargo.

The collective bargaining agreement between JBT and Local 1408 contains a no-strike clause [2] and an arbitration clause.[3] JBT sought to compel arbitration with the

---

2. The clause reads:

During the term of this agreement the employer agrees that there shall be no lockout of the members of the Union, and the Union agrees that there shall not be any strike of any kind or degree whatsoever, walkout, suspension of work, curtailment or limitation of production, slowdown, or any other interruption or stoppage, total or partial, of the employer's operation for any cause whatsoever.

3. Paragraph 15B of the Agreement provides, "Matters under dispute which cannot be promptly settled between the Local and an indi-

vidual Employer" shall be referred to arbitration.

Paragraph 15F of the contract provides:

The Union agrees that this Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that during the term of this Agreement the Employers will not be required to negotiate on any further matters affecting these or other subjects not specifically set forth in this Agreement. Anything not contained in this Agreement shall not be construed as being part of this Agreement.

union. Pending arbitration it sought a temporary restraining order and preliminary injunction to halt the boycott. The district court, denying the union the opportunity to express what the judge termed its "legitimate outrage in this singular manner," ordered the union to process its grievance in accordance with the contractual grievance procedure and enjoined it from refusing to work aboard the three ships then in port.

Shortly after the injunction was issued, the JULIA L was loaded with grain and departed from New Orleans. The three Norwegian vessels were loaded with SPA and left Jacksonville. Thereafter, effective February 4, 1980, the International Trade Administration of the Department of Commerce changed the regulations governing the export of certain commodities, including phosphoric acid, and now requires the issuance of validated licenses before such commodities can be exported. Simultaneously, new licensing was suspended. 45 Fed.Reg. 8293 (Feb. 7, 1980). On February 25, the President extended the trade embargo with the Soviet Union to include SPA and other phosphates.

The unions, appealing both injunctions, contend that the cases are, nonetheless, not moot, that the first amendment protects each union and its members from an injunction requiring them to abandon an effort to express their political views and that each injunction was improperly granted on other grounds. Some issues are common to both appeals; some are different in each, but all are governed by the same principles. We, therefore, consolidated the appeals and will consider them in this one opinion.

## II.

The constitution limits the jurisdiction of federal courts to "cases or controversies." Art. III, § 2, United States Constitution. If, as a result of events that have occurred after a suit has started, even while it is on appeal, the litigants no longer have an actual dispute, the case is said to be moot, to present a question of academic interest rather than of decision of the rights of the parties. A case thus mooted is not a controversy within the meaning of the Constitution. *Liner v. Jafco, Inc.*, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964); Note, The Mootness Doctrine in the Supreme Court, 88 Harv.L.Rev. 373, 378 (1974). While the record is not entirely clear, it appears that some licensed grain is still being exported to the Soviet Union and that, therefore, to the extent the injunction issued by the district court for the Eastern District of Louisiana prohibits interference with loading that grain, the real controversy continues.[4] While the record is unclear concerning SPA, statements made at oral argument indicate that some is still being loaded for shipment to the Soviet Union. We need not remand, however, for a factual determination in this respect because we find jurisdiction on another basis.

In some instances, despite the fact that the immediate dispute has been resolved, it may still be appropriate for a court to consider the litigation. See G. Gunther, Cases and Materials on Constitutional Law 1578 (9th ed. 1975). If it is probable that similar cases will arise in the same fashion in the future and the underlying dispute will, as a result of similar occurrences, evade judicial review, there is a sufficient case to satisfy the constitutional requirement. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). However, if the case is not presented as a class action, mootness can be avoided only if the challenged action is in duration too short to be litigated fully prior to its cessation or expiration and there is a reasonable

4. In *Philadelphia Marine Trade Ass'n v. ILA, Local 1291*, 365 F.2d 295 (3rd Cir. 1966), *rev'd on other grounds*, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), the case was held not moot where the arbitration award extended to future violations of the collective bargaining agreement and the district court retained jurisdiction to enforce the award against any subsequent violation after the current work stoppage ceased. The award of Arbitrator McAulay in the NOSSA suit is similarly applicable to subsequent disputes.

expectation that the same complaining party would again be subjected to the same action. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

The loading or unloading of a vessel requires but a day or two. If an injunction is issued against loading or unloading, unless this court grants a stay order, the vessel will have departed before an appellate court can review the injunction. Thus, the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration.

Unlike the situation in *General Electric Co. v. Local Union 191,* 443 F.2d 608, 610 (5th Cir. 1971), *vacated and remanded,* 398 U.S. 436, 90 S.Ct. 1883, 26 L.Ed.2d 384 (1970), where we found "no possibility of a recurrence of strikes" and the contract had expired, in the instant case there is a real possibility of the recurrence of work stoppages absent judicial intervention. Therefore, the second part of the jurisdictional test is satisfied: there is a reasonable expectation that the same complaining party will be subjected to the same action again.

The policy of the ILA continues. The Soviet Union's troops remain in Afghanistan. Unless we review the injunction now, the controversy is capable of repetition in a fashion that would again evade review.

### III.

 The first amendment is absolute in terms: Congress shall make no law abridging the freedom of speech. Its protection extends to labor union activities. *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The first amendment shields not only verbal and written messages, purely communicative, but also conduct designed to express and convey ideas. *See, e. g., Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *See Nim-*

mer, The Meaning of Symbolic Speech Under the First Amendment, 21 U.C.L.A. L. Rev. 29 (1973). It prohibits not only statutory abridgment but all governmental action including judicial action that restrains free expression. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *American Federation of Labor v. Swing,* 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941).

The Supreme Court has frequently distinguished between "pure speech" and what it has labelled "speech-plus"—expressive conduct arousing action. *See, e. g., Cox v. Louisiana* (Cox II), 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *Teamsters Local 695 v. Vogt, Inc.,* 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957); *Bakery & Pastry Drivers Local 802 V. Wohl,* 315 U.S. 769, 776–77, 62 S.Ct. 816, 819–20, 86 L.Ed. 1178 (1942).[5]

While "pure speech" is seldom subject to any governmental action, "speech-plus," the Supreme Court has held, is subject to governmental regulation, and even perhaps restraint, when the action is warranted by a compelling government interest. *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968); *Adderly v. Florida,* 385 U.S. 39, 48 n.7, 87 S.Ct. 242, 247 n.7, 17 L.Ed.2d 149 (1967); *Cox v. Louisiana* (Cox II), 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965). *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942) ("fighting words"); *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919) ("clear and present danger that they will bring about the substantive evils that Congress has a right to prevent"); *Wood v. Georgia,* 370 U.S. 375, 383–85, 82 S.Ct. 1364, 1369–70, 8 L.Ed.2d 569 (1962); *Dennis v. United States,* 341 U.S. 494, 503–10, 71 S.Ct. 857, 864–68, 95 L.Ed. 1137 (1951).

 Just as the states may regulate labor relations, at least in areas not preempted by federal action, and enjoin peace-

---

**5.** The distinction has been criticized as having "no real content" because all communication involves conduct. L. Tribe, American Constitutional Law 599 *et seq.* (1978).

ful picketing aimed at preventing effectuation of the state's policy, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), the Congress may regulate labor relations affecting interstate commerce and the federal courts may implement congressional policy by enjoining action that obstructs it,[6] *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). *See Retail Clerks, Local 1625 v. Schermerhorn*, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963); *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); *Railway Employees' Department v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). Thus, an injunction against picketing or threats in violation of the "secondary boycott" provisions of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4), is not proscribed. *Electrical Workers, Local 501 v. N.L.R.B.*, 341 U.S. 694, 705, 71 S.Ct. 954, 960, 95 L.Ed. 1299 (1951); *Burr v. N.L.R.B.*, 321 F.2d 612 (5th Cir. 1963); *N.L.R.B. v. Local Union No. 3, Electrical Workers*, 477 F.2d 260 (2d Cir. 1973), *cert. denied*, 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973). We have, prior to the decision in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), ordered arbitration of a labor dispute and enjoined a strike pending arbitration. *West Gulf Maritime Ass'n v. I.L.A.*, 413 F.Supp. 372 (S.D.Tex.1975), *aff'd* 531 F.2d 574 (5th Cir. 1976). *See also Hughes v. Superior Court*, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); *Colonial Sand & Stone Co. v. Geoghegan*, 367 F.Supp. 932 (S.D.N.Y.1973).

■ The first amendment "does not protect behavior made unlawful by legitimate legislation or regulation, enacted for purposes unrelated to the suppression of free expression." *Bullock v. Mumford*, 509 F.2d 384, 387 (D.C. Cir. 1974); *American Radio Ass'n v. Mobile Steamship Ass'n*, 419 U.S. 215, 228–32, 95 S.Ct. 409, 417–419, 42 L.Ed.2d 399 (1974); *Teamsters Local 695 v.*

*Vogt, Inc.*, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957); *Carpenters & Joiners Union Local 213 v. Ritter's Cafe*, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143 (1942). The work stoppage occasioned only by words is not to be distinguished from one occasioned by a picket line.

The argument that the injunction against the refusal to work ships is a "prior restraint" on speech does not withstand analysis. Neither President Gleason nor any other ILA officer or member is enjoined from speaking. They are enjoined simply from continuing a work stoppage already commenced in the NOSSA case and threatened in the JBT case.

■ The court's order prohibits only a concerted work stoppage, and cannot be construed as an edict requiring an individual to perform personal services. An employee remains free to quit his employment at any time. The argument that the district court injunction enforced a promise to render personal services has, therefore, been rejected on numerous occasions by the Supreme Court. *See, e. g., UAW Local 232 v. Wisconsin Employment Relations Board*, 336 U.S. 245, 251, 69 S.Ct. 516, 520, 93 L.Ed. 651 (1949) *overruled on other grounds, Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Board*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). *See also N.L.R.B. v. Local 74, Carpenters & Joiners*, 181 F.2d 126, 132 (6th Cir. 1950), *aff'd*, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309 (1951); *N.L.R.B. v. National Maritime Union*, 175 F.2d 686, 692 (2d Cir. 1949), *cert. denied*, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 1348 (1950). We conclude that neither the first nor the thirteenth amendment was violated by either injunction.

### IV.

■ In the absence of constitutional restraint, the propriety of issuance of an injunction must be evaluated in the light of conflicting national policies, expressed in statutes: on the one hand, the federal stat-

---

**6.** Because we are here discussing constitutional power, we do not pause to consider statutory restrictions on the judiciary such as those imposed by the Norris-LaGuardia Act, 29 U.S.C. § 104. We will, however, hereafter consider the effect of that statute on court action.

ute forbidding the issuance of injunctions in labor disputes and, on the other, those enactments favoring the resolution of such differences by arbitration.

### A.

■ The Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, was adopted in 1932 to curb federal courts in their use of injunctions against strikes and other economic weapons in labor disputes.[7] Section 4(a) of the Act, 29 U.S.C. § 104(a) reads: ·

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction *in any case involving or growing out of any labor dispute* to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
>
> (a) Ceasing or refusing to perform any work or to remain in any relation of employment. (Emphasis added).

Thus Norris-LaGuardia is limited to cases "involving or growing out of" a "labor dispute." Section 13(c) of the Act, 29 U.S.C. § 113(c), defines "labor dispute" as follows:

> (c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

A panel of this court in 1975 held that a strike to achieve a political goal is a labor dispute within the meaning of the Norris-LaGuardia Act. *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236 (5th Cir. 1975), *rehearing denied*, 526 F.2d 376 (1976), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976).[8] The strike was aimed "at the national policy of this country's permitting the importation of South African coal." 519 F.2d at 1247. The panel found that an injunction issued by the district court violated Section 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109, which, like § 4 of the Act, applies only in cases "involving or growing out of a labor dispute."

That decision was rendered on September 24, 1975, after oral argument and submission. Shortly thereafter, another panel of this court considered a similar problem and reached an apparently inconsistent decision. In *West Gulf Maritime Ass'n v. ILA*, 413 F.Supp. 372 (S.D.Tex.1975), *aff'd summarily*, 531 F.2d 574 (5th Cir. 1976), the union, in violation of a no-strike agreement, had refused to load grain on a ship bound for the Soviet Union until the president of ILA was satisfied that the interests of the American public were adequately protected. Noting that the underlying dispute involved a political issue, the district court found there was no labor dispute and held Section 4 of the Norris-LaGuardia Act inapplicable. *Accord, Harrington & Co. v. ILA, Local 1416*, 356 F.Supp. 1079 (S.D.Fla.1973); *Khedivial Line, SAE v. Seafarers' International Union*, 278 F.2d 49 (2nd Cir. 1960). *Cf. NLRB v. International Longshoremen's Ass'n (Ocean Shipping)*, 332 F.2d 992 (4th Cir. 1964) (politically-motivated boycott held not a labor dispute within the meaning of the

---

7. *See* Note, *Buffalo Forge Co. v. United Steelworkers*: The Supreme Court Sanctions Sympathy Strikes, 25 Clev.St.L.Rev. 435 (1976). Congress intended to take the federal courts out of the "labor injunction business." *Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960); S.Rep. No. 163, 72d Cong., 1st Sess. 7–8 (1932); H.R.Rep. No. 669, 72d Cong., 1st Sess. 2–3 (1932); 75 Cong.Rec. 5464, 5467, 5478 (1932). *See* F. Frankfurter & N. Greene, The Labor Injunction 24–46, 131–33, 200–02 (1930). *See also* A. Cox, D. Bok, R. Gorman, Cases on Labor Law 60 (8th ed. 1977); O. Fiss, Injunctions 580–612 (1972); Statutory History of the United States: Labor Organizations 161–247 (R. Koretz ed. 1970).

8. The Supreme Court in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) cited this court's decision in *United States Steel Corp.* as "in accord" with the Second Circuit decision affirmed by the Supreme Court in *Buffalo Forge*. 428 U.S. at 404 n.9, 96 S.Ct. at 3146 n.9, 49 L.Ed.2d at 1028 n.9.

Labor Management Relations Act). The decision was affirmed summarily without an opinion and, so far as we can determine, without the members of the panel of this court being aware of the *United States Steel Corp.* decision. The possibility of such a regrettable occurrence appears to lurk continually in the proceedings of a multi-panel court for it is difficult to devise a process that will expose the similarity of issues in pending cases before decisions are published.

▇▇▇▇ We find it difficult satisfactorily to reconcile these decisions. To the extent that they are inconsistent, we consider the rationale of *United States Steel Corp.* to be more persuasive. Moreover, it was decided after oral argument and by a written opinion while there was but a summary affirmance in *West Gulf Maritime.* Adhering to the earlier and more fully expressed opinion, we find that a strike called to further the political goals of the union does "involve or grow out of any labor dispute" for purpose of the Norris-LaGuardia Act.[9]

### B.

A few years after the adoption of the Norris-Laguardia Act Congress fostered collective bargaining by enacting the Wagner Act, the National Labor Relations Act of 1935. In 1947, it modified national labor policy by enacting the Taft-Hartley Act, the Labor Management Relations Act of 1947.

▇▇▇ National policy, embodied in the National Labor Relations Act, as thus amended June 23, 1947, 29 U.S.C. § 173(d), favors the orderly resolution of labor-management grievances through arbitration. *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

Moreover, the Labor Management Relations Act (LMRA) authorizes federal courts to entertain suits to enforce collective bargaining agreements. Section 301(a), 29 U.S.C. § 185(a). These provisions, in combination, created the basis for suits to enforce arbitration agreements by injunction. However, Congress did not repeal the Norris-LaGuardia Act ban on injunctions, considering and rejecting a proposal to do so.[10]

▇▇▇ The anti-injunction policy of the Norris-LaGuardia Act is not an impediment to specific performance of the promise to arbitrate. The Supreme Court has, since *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), consistently upheld the validity of orders

---

9. Whether a dispute involving a political question is "in commerce" within the meaning of the provisions of the Labor Management Relations Act (LMRA) regulating secondary boycotts is a different question, which we consider separately in the cases of *Baldovin v. International Longshoremen's Ass'n,* 626 F.2d 445 (5 Cir.) and *Mack v. International Longshoremen's Ass'n,* 626 F.2d 445 (5 Cir.). Although the LMRA reaches activities "in commerce" to the full extent of the Congressional power under the commerce clause, *NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963), a labor dispute does not automatically come within the jurisdiction confines of the Act. *Windward Shipping (London) Ltd. v. American Radio Ass'n,* 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974). Whether an activity constitutes a labor dispute is an inquiry separate and distinct from the effect of that activity on commerce. "The National Labor Relations Act does not extend to all industries and all employees. It is only applicable to those employments in which strikes and labor disputes would affect interstate commerce . . . ." *Alabama State Federation of Labor, Local No. 103 v. McAdory,* 325 U.S. 450, 464, 65 S.Ct. 1384, 1391, 89 L.Ed. 1725 (1945).

10. "In the course of enacting the Taft-Hartley Act, Congress rejected the proposal that the Norris-LaGuardia Act's prohibition against labor-dispute injunctions be lifted to the extent necessary to make injunctive remedies available in federal courts for the purpose of enforcing collective-bargaining agreements." *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 409, 96 S.Ct. 3141, 3148, 49 L.Ed.2d 1022 (1976). The relevant legislative history is discussed in *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 205–09, 82 S.Ct. 1328, 1334–36, 8 L.Ed.2d 440 (1962).

compelling the arbitration of a labor dispute. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Nolde Brothers, Inc. v. Local No. 358, Bakery Workers Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). However, these cases do not involve the power of a court to enjoin a strike pending the arbitration of the dispute.

■ Moreover, because of the national labor policy in support of agreed upon dispute-settlement procedures, an injunction may issue to prevent the violation of an arbitration award, once rendered. Such an injunction is deemed authorized by the LMRA of 1947, limiting the reach of the Norris-LaGuardia anti-injunction policy. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *International Ass'n of Machinists, District 776 v. Texas Steel Co.*, 538 F.2d 1116 (5th Cir. 1976); *Pacific Maritime Ass'n v. International Longshoremen's and Warehousemen's Union*, 517 F.2d 1158 (9th Cir. 1975); *New Orleans Steamship Ass'n v. General Longshoreworkers Local 1418*, 389 F.2d 369 (5th Cir. 1968), *cert. denied*, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968); *Philadelphia Marine Trade Ass'n v. International Longshoremen's Ass'n, Local 1291*, 365 F.2d 295 (3rd Cir. 1966), *rev'd on other grounds*, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967); *Pacific Maritime Ass'n v. International Longshoremen's and Warehousemen's Union*, 304 F.Supp. 1315 (N.D.Calif.1969), *aff'd on other grounds*, 454 F.2d 262 (9th Cir. 1971). As the Supreme Court pointed out in *Buffalo Forge*, "were the issue arbitrated and the strike found illegal, the relevant federal statutes as construed in our cases would permit an injunction to enforce the arbitral decision." 428 U.S. at 406, 96 S.Ct. at 3147, 49 L.Ed.2d 1022.

The latent conflict between the LMRA and Norris-LaGuardia when an injunction against a strike is sought pending arbitration was considered in *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1965), reconsidered in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) and again reviewed in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022.[11] *See also* our review in *Jacksonville Maritime Ass'n v. International Longshoremen's Ass'n*, 571 F.2d 319 (5th Cir. 1978).

In *Boys Markets* the Supreme Court favored accommodation of the seemingly absolute terms of the Norris-LaGuardia Act and the policies of LMRA. Overruling its prior decision in *Sinclair Refining*, the court held that a federal court has power to enjoin a strike "over a grievance which both parties are contractually bound to arbitrate" if the employer is "ordered to arbitrate, as a condition of his obtaining [the] injunction." 398 U.S. at 255, 90 S.Ct. at 1594, 26 L.Ed.2d at 212. *See Jacksonville Maritime Ass'n v. International Longshoremen's Ass'n*, 571 F.2d 319 (5th Cir. 1978). *Cf. Sea-Land Service, Inc. v. International Longshoremen's Ass'n*, 625 F.2d 38, (5th Cir. 1980) (*Boys Markets* injunction may not be issued pending ongoing NLRB proceedings).

The Supreme Court refined the criteria for issuance of a *Boys Markets* injunction in *Buffalo Forge*, which involved a sympathy strike by a union that had agreed to a no-strike clause in a collective bargaining agreement. The company sought to enjoin the strike pending arbitration of the issue whether the strike violated the contract. The Supreme Court's 5-4 decision noted: "The Union has gone on strike not by reason of any dispute it or any of its members has with the employer, but in support of other local unions . . . ." 428 U.S. at 404-05, 96 S.Ct. at 3146, 49 L.Ed.2d at 1029. "Whether the sympathy strike the Union called violated the no-strike clause, and the

---

11. *See* Cohen, Strikes and Injunctions: The Buffalo Forge Case, 30 N.Y.U.Conf.Lab. 171 (1977).

appropriate remedies if it did, are subject to the agreed-upon dispute-settlement procedures of the contracts and are ultimately issues for the arbitrator." 428 U.S. at 405, 96 S.Ct. at 3146, 49 L.Ed.2d at 1029. However, even though the strike might violate the no-strike provision of the contract and its validity be the subject of arbitration, the strike could not be enjoined if it "was not *over* any dispute between the Union and the employer" that was subject to the arbitration provisions of the contract, 428 U.S. at 407, 96 S.Ct. at 3148.[12]

■ Thus the crucial distinction is whether arbitration would resolve the dispute that led to the strike. Reviewing this line of Supreme Court decisions in *Jacksonville Maritime*, we upheld the issuance of an anti-strike injunction where "(1) the strike [breaches] a no-strike obligation under an effective collective bargaining agreement; (2) the strike [is] over an arbitrable grievance; *and* (3) both parties [are] contractually bound to arbitrate the underlying grievance caused by the strike." 571 F.2d at 323. These continue to be the prerequisites.

## V.

In one of the consolidated appeals presently before this court, the *Jacksonville Bulk Terminals* case, the district court issued a prearbitration injunction restraining the union's work stoppage as to shipments of cargo to Russia aboard three vessels. Since we have already determined that the strikes in the instant cases, aimed at effectuating the political goals of the union, "involve or grow out of" a labor dispute, the injunction is invalid under Section 4 of Norris-LaGuardia unless it complies with the limited *Boys Markets* exception.

That injunction fails to meet the second requisite for a *Boys Markets* injunction as articulated by this Court in *Jacksonville Maritime*: no arbiter could resolve the grievance between the ILA and the Soviet Union. The union's grievance is not, as asserted by JBT, a complaint against JBT

doing business with the Soviets. It is a complaint against the actions of the U.S. S.R. itself. The union seeks to deny the Soviets the benefit of the labor of its members so long as that nation is engaged in what the union considers aggression. Unfortunately, no arbitrator can tell the Soviets to withdraw from Afghanistan.

■ The Florida district court's judgment ordered the union to process any grievance over the shipment of cargo to the Soviet Union aboard the three vessels in accordance with the procedure contained in the arbitration clause of the contract. But an order to compel arbitration may issue only if the dispute is arbitrable. Arbitrability is a question for the court to pass on in the first instance. *Mobile Oil Corp. v. Local 8–766, Oil, Chemical & Atomic Workers*, 600 F.2d 322, 324 (1st Cir. 1979); *Local Union No. 787, Electrical, Radio & Machine Workers v. Collins Radio Co.*, 317 F.2d 214, 216 (5th Cir. 1963). While the question whether the strike itself violated the parties' agreement is arbitrable, the underlying dispute between the ILA and the Soviet Union is not. To the extent that the Florida judgment compels the parties to submit the former question to arbitration, it is affirmed; to the extent it demands arbitration of the underlying dispute it goes beyond the court's power and is vacated.

■ The union suggests that the New Orleans arbitrators went beyond their authority. Judicial deference to arbitration does not, of course, grant carte blanche approval to any decision an arbitrator might make. *Machinists, Local 2003 v. Hayes Corp.*, 296 F.2d 238, 243 (5th Cir. 1961), *aff'd on rehearing*, 316 F.2d 90 (5th Cir. 1963). The arbitrator's authority is circumscribed by the arbitration agreement, and he can bind the parties only on issues that they have agreed to submit to him. Whether an arbitrator has exceeded these bounds is an issue for judicial resolution. *Torrington Co. v. Metal Products Workers,*

---

12. We had previously reached this same conclusion in *Amstar Corp. v. Meat Cutters*, 468 F.2d 1372 (5th Cir. 1972). *See Buffalo Forge*

*Co. v. United Steelworkers*, 428 U.S. at 404 n.9, 96 S.Ct. at 3146 n.9.

*Local 1645*, 362 F.2d 677, 680 (2nd Cir. 1966). The award is not, however, tested by judicial review of the legal principles applicable or the application of some sort of clearly erroneous test to the findings of the fact. The award need only draw its essence from the collective bargaining agreement. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428; *Safeway Stores v. American Bakery & Confectionary Workers*, 390 F.2d 79, 81 (5th Cir. 1968). We find each of the arbitrator's awards here sufficiently nurtured by the no-strike clause of the contract and it does not sap their essence that the underlying dispute was not itself arbitrable. A union may agree not to strike over any issue, arbitrable or not. Whether in this case it did was a question for the arbiters.

■ Insofar as the decision of the district court for the Eastern District of Louisiana granted an injunction to prevent violation of the arbitration awards actually made, it is affirmed. However, arbitrators' decisions can only be enforced as written. "It is the arbitrator's construction which was bargained for; . . . the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 599, 80 S.Ct. at 1362, 4 L.Ed.2d at 1429. *International Ass'n of Machinists v. Modern Air Transport, Inc.*, 495 F.2d 1241 (5th Cir. 1974); *San Antonio Newspaper Guild Local No. 25 v. San Antonio Light Division*, 481 F.2d 821 (5th Cir. 1973).

■ Arbitration is a dispute-settlement procedure that is a part of the collective bargaining process. *Piggly Wiggly Operators' Warehouses, Inc. v. Piggly Wiggly Operators' Warehouse Independent Truck Drivers Union, Local No. 1*, 611 F.2d 580 (5th Cir. 1980). It is not a judicial forum. Whether there is a "law of the contract"

between the parties once an arbitrator decides an issue and what effect, if any, is to be given precedent are not primarily, if at all, questions for judicial resolution.

■ The Louisiana district court's judgment does more than merely enforce the awards as written: it applies the arbitration award of arbitrators Caraway and Maxwell, carefully limited by them to one vessel, to other vessels that may hereafter arrive at the Port of New Orleans. In this regard it enjoins future strikes over underlying grievances not subject to arbitration and makes the arbitrator's award precedential.[13] Whether the award can be given an effect akin to res judicata or stare decisis with regard to future disputes that may arise between the parties, neither the district court nor this court should decide. If the parties do not agree, that issue itself is a proper subject for arbitration.

Accordingly, the New Orleans injunction must be limited to restraint of strikes that violate the specific arbitration awards as rendered. This, of course, means that the injunction against strikes by ILA locals 1683 and 1802 will be broader than the injunction against strikes by ILA locals 1418, 1419 and 1497. That is not a consequence of judicial inconsistency but of the operation of the three separate dispute settlement procedures in three separate contracts.

## VI.

■ Subject to the limitations of the constitution, national labor policy is to be made by the Congress. It is for the legislature to determine whether boycotts or strikes are to be sanctioned, encouraged or prohibited, as well as whether injunctions are, or are not, an acceptable means of intervention. We conclude that the controlling statutes permit the use of an injunction to prohibit strikes in violation of an arbitra-

**13.** The district court cited *Pacific Maritime Ass'n v. International Longshoremen's and Warehousemen's Union*, 454 F.2d 262 (9th Cir. 1971) to support its decision to extend the awards of arbitrators Maxwell and Caraway to include all grain which has been issued a Unit-

ed States export license. That decision affirmed the issuance of an injunction against subsequent violations of an arbitrator's award. It did not involve an expansion by the court of the arbitrator's award, and it is, therefore, inapposite.

tor's award, but disallow injunctive relief prior to arbitration to prevent work stoppages that result from grievances not resoluble by arbitration even though such work stoppages may violate a no-strike clause.

Accordingly, the preliminary injunction ordered by the judgment of the Middle District of Florida is VACATED. Insofar as that judgment ordered the parties to submit to arbitration the question whether the work stoppage violated the no-strike clause, it is AFFIRMED. The case is REMANDED for further proceedings consistent with this opinion.

The judgment of the Eastern District of Louisiana is AFFIRMED insofar as it issues a preliminary injunction against ILA Locals 1683 and 1802 in accordance with the award of Arbitrator McAulay. The preliminary injunction against ILA Locals 1418, 1419 and 1497 based on the awards of Arbitrators Caraway and Maxwell, is VACATED and the case is REMANDED for further proceedings consistent with this opinion.