**NYP HOLDINGS, INC. d/b/a New York Post, Plaintiff,**

v.

**NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, Ronald O'Keefe, and John Does Nos. 1 through 20, Defendants.**

No. 07 CV 2133(VM).

United States District Court, S.D. New York.

April 24, 2007.

Michael Starr, Vanessa Marie–Carmelle Thomas, Hogan & Hartson, L.L.P., New York, NY, for Plaintiff.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff NYP Holdings, Inc. d/b/a New York Post (the "Post") brought this action against defendants Newspaper and Mail Deliverers' Union of New York and Vicinity ("NMDU"), Ronald O'Keefe ("O'Keefe"), the President of the NMDU, and John Does Nos. 1 through 20 (collectively, "Defendants") pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Post seeks an injunction barring Defendants from engaging in any work stoppage for the duration of the negotiations currently underway between the Post and the International Union of Operating Engineers, Local 94–94a–94b ("Local 94"). On March 16, 2007, the Court heard arguments from the parties as to whether a temporary restraining order should be issued pending a hearing on the Post's request for a preliminary injunction. At that hearing, the Court denied

the request for a temporary restraining order. On April 4, 2007 and April 6, 2007, the Court held a hearing on the Post's application for a preliminary injunction. For the reasons set forth below, that application is DENIED.

## I. BACKGROUND[1]

The events giving rise to the dispute before the Court occurred in the late night hours of February 28, 2007 and the early morning of March 1, 2007 at the Post's printing and distribution facility in the Bronx, New York. On the night of February 28, Local 94 called a strike and some of its members began picketing the facility. It is undisputed that, for some period of time during that night, certain of the NMDU drivers refused to leave the facility and deliver newspapers. The parties offer differing views, however, on the reason underlying the drivers' work stoppage.

The NMDU claims that the drivers acted out of concern for their safety. It had been reported that before midnight on February 28, a bottle had been thrown from a highway overpass at the windshield of a Post truck driven by an NMDU member, shortly after it had left the facility. The bottle shattered the windshield, causing the truck to return to the facility. The NMDU claims that its drivers believed the bottle had been thrown by a member of Local 94 or someone else sympathetic to that union's strike, and that they refused to drive their trucks out of genuine fear for their own safety.

The Post contends that the drivers' work stoppage was unrelated to this incident and was actually a sympathy strike with Local 94. The Post, invoking a no-strike provision in the parties' collective bargaining agreement (the "CBA"), seeks to enjoin the NMDU from any further work stoppages for the duration of its negotiations with Local 94 because it believes that the threat of a sympathy strike by the NMDU gives Local 94 an unfair degree of leverage with which to negotiate.

At approximately 1:00 a.m. on March 1, seeking to resolve the situation, the Post availed itself of a remedy provided by the CBA and contacted the designated arbitrator, John Donoghue, by telephone for an emergency hearing. Representatives of the Post and the NMDU participated in the conference call with the arbitrator.

At approximately 2:00 a.m., after hearing arguments from both sides, the arbitrator issued a "status quo order," directing the NMDU drivers to return to work on the condition that the Post help to ensure their safety by assigning two drivers per truck for the remainder of that morning. At some time after the arbitrator issued his order, the NMDU drivers returned to work. The NMDU claims that the drivers returned to work after having the ruling explained to them and being assured that members of Local 94 would not take any actions against them. The Post claims that the drivers returned to work only after the Post agreed to further negotiations with Local 94. The Post al-

1. The factual summary that follows derives primarily from the Complaint; the Memorandum of Law in Support of Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction, dated March 12, 2007; the Memorandum of Law of Defendants Newspaper and Mail Deliverers' Union of New York and Vicinity and Ronald O'Keefe in Opposition to Plaintiff's Application for Preliminary Injunction, dated March 23, 2007; Plaintiff's Reply Memorandum of Law in Further Support of its Application for a Preliminary Injunction, dated March 29, 2007; the transcript of the testimony recorded in the Court's hearings on March 16, 2007, April 4, 2007, and April 6, 2007; and the evidence admitted at those hearings. Except where specifically referenced, no further citation to these sources will be made.

leges that because of the work stoppage, approximately 150,000 Sports Extra newspapers were not delivered that morning, resulting in an incalculable loss of goodwill.

## II. DISCUSSION

■ Section 301(a) of the Labor Management Relations Act ("LMRA") provides that "[s]uits for violation of contracts between an employer and a labor organization" may be heard by United States district courts. 29 U.S.C. § 185(a). Despite this broad language, when an employer seeks injunctive relief against a labor union, a court must also consider the prohibitions set forth in the Norris LaGuardia Act ("NLGA"). 29 U.S.C. § 101 et seq. Section 4 of the NLGA deprives federal courts of authority, "in any case involving or growing out of any labor dispute," to issue injunctions preventing a labor union from engaging in certain activities, including "[c]easing or refusing to perform any work." 29 U.S.C. § 104.

■ The NLGA's limitation on injunctive relief, however, is not absolute. The Supreme Court has held that district courts retain the authority to issue injunctions in certain discrete situations. In Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Court held that where a collective bargaining agreement contains a provision mandating the settlement of grievances through arbitration, a district court may issue an injunction prohibiting a labor union from striking and ordering an employer to arbitrate. The Court found that "a no-strike obligation, express or implied, is the quid pro quo for an undertaking by the employer to submit grievance disputes to the process of arbitration." Id. at 248, 90 S.Ct. 1583. Acknowledging a tension between the NLGA and the LMRA, the Court stated that "[t]he literal terms of § 4 of the Norris–

LaGuardia Act must be accommodated to the subsequently enacted provisions of § 301(a) of the Labor Management Relations Act and the purposes of arbitration." Id. at 250, 90 S.Ct. 1583. Accordingly, an employer may seek a so-called Boys Markets injunction to hold a labor union to its promise under a collective bargaining agreement not to strike over any arbitrable grievance. See Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 420, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981) ("Boys Markets permits injunctions to terminate strikes pending arbitration if the grievance underlying the strike is arbitrable.").

Additionally, where the parties have already engaged in arbitration, a district court may issue an injunction enforcing the arbitration award. In Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO, the Supreme Court stated in dictum that "were the issue arbitrated and the strike found illegal, the relevant federal statutes as construed in our cases would permit an injunction to enforce the arbitral decision." 428 U.S. 397, 405, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). See also Boston Celtics Ltd. P'ship v. Shaw, 908 F.2d 1041, 1047–48 (1st Cir.1990) ("Well-established public policy embodied in statute, in Supreme Court decisions, and in numerous lower court opinions, strongly favors judicial action to 'effectuate[ ] ... the means chosen by the parties for settlement of their differences under a collective bargaining agreement. . . .' That judicial action clearly may include a preliminary injunction enforcing an arbitration award . . . .") (citations omitted); New Orleans Steamship Ass'n v. Gen. Longshore Workers, 626 F.2d 455, 466 (5th Cir.1980) ("[B]ecause of the national labor policy in support of agreed upon dispute-settlement procedures, an injunction may issue to prevent the violation of an arbitral award, once rendered."), aff'd sub nom. Jackson-

*ville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982); *New York Times Co. v. New York Stereotypers Union No. 1,* No. 92 Civ. 6730, 1992 WL 251457, *2 (S.D.N.Y. Sept. 18, 1992) ("Since the *Boys Markets* ruling, the Supreme Court has suggested and a number of circuit courts have expressly held that district courts may also enjoin union conduct that violates a proper and valid arbitration award."). As the Supreme Court stated in *Buffalo Forge,* "[t]he driving force behind *Boys Markets* was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties." 428 U.S. at 407, 96 S.Ct. 3141. District courts support this congressional preference by enforcing valid arbitration awards.

The instant case, as the Post acknowledges, does not fall within the *Boys Markets* exception to the NLGA because the Post does not seek an injunction pending arbitration. Instead, the Post contends that it merely seeks to enforce the arbitration that has already been rendered.

The arbitrator's Status Quo Order (the "Order"), originally issued over the telephone on March 1, 2007, was memorialized on March 7, 2007. (*See* Status Quo Order, attached as Ex. B to the Affidavit of Kenneth Chiarella "Chiarella Aff.") The Order summarizes the arguments made by the Post and the NMDU at the March 1 telephone conference: the NMDU argued that its drivers were refusing to leave the worksite because they feared for their safety; the Post argued that the NMDU was engaged in a sympathy strike with Local 94. It states that the Post offered to provide extra security to the drivers "through either the presence of a foreman who would accompany each truck for the first ten blocks of its departure, or in the alternative, by doubling up of drivers for

the morning of March 1." (*Id.*) The Order concludes:

> After some discussion, I issued a Status Quo Order, directing members of the NMDU to cease and desist from refusing to perform services, finding that their refusal was in violation of the provisions of the "no strike" clause. The Post's offer is found to be a reasonable effort to provide security to drivers against possible misconduct of strikers or persons acting in concert with them. The directive was based upon assurances of the Employer that there would be two drivers (employees) in each truck for the morning of March 1, 2007.

(*Id.*) The Posts now asks the Court to enforce this arbitration order by enjoining the NMDU from striking until the Post completes its negotiations with Local 94.

The parties disagree sharply as to how the Order should be interpreted by the Court. The NMDU argues that the Order is clearly limited by its own terms to events that occurred on the morning of March 1. The arbitrator, having heard arguments from both sides as to the reason for the work stoppage, ordered the drivers to return to work on the condition that the Post provide additional security as it had offered. In the view of the NMDU, the Order places no further obligation on either party beyond that morning. The Post, on the other hand, argues that the Order imposes a continuing obligation on the NMDU not to strike for as long as there was an occasion for a sympathy strike, *i.e.,* until the Post concludes its negotiations with Local 94.

Having closely reviewed the text of the Order, the Court concludes while its wording is admittedly somewhat ambiguous, the more persuasive reading of the Order is that it is, in fact, limited to the circumstances that prevailed on March 1. On its face, the Order simply resolves the dispute

that was occurring that morning, and it makes no explicit reference to any other time period. Had the arbitrator determined that the NMDU was engaged in a sympathy strike, it might be reasonable to infer that the Order was intended to have continuing effect for as long as negotiations are ongoing with Local 94.

However, although the arbitrator found that the NMDU had violated the "No Strike, No Lockout" provision of the CBA, that provision is not limited to sympathy strikes and applies to any strike or cessation of work. Thus, the Order does not clearly reflect any finding by the arbitrator as to whether the drivers' refusal to work was a reaction to safety concerns or constituted a sympathy strike. That the arbitrator conditioned his ordering the drivers to return to work on the Post's agreement to provide increased security suggests that he placed at least some credence in the NMDU's stated concern over the safety of its drivers. Because the arbitrator did not make an explicit finding that the drivers' refusal to work amounted to a sympathy strike, there is no basis for the Court to infer that the Order was intended to have continuing effect beyond March 1. As the court stated in *New Orleans Steamship*, "arbitrators' decisions can only be enforced as written," and a district court may not usurp the functions of the arbitrator by reviewing its factual findings under a standard of clear error. 626 F.2d at 468.

■ The injunction sought by the Post, therefore, does not fall within either of the exceptions to the NLGA described above. It is neither an injunction pending arbitration nor an injunction to enforce a valid arbitration order still in effect. In light of the Court's interpretation of the Order, the injunction sought by the Post must be viewed as prospective relief against conduct by the NMDU that might occur in the future and that is not clearly proscribed by an arbitration order.

■ To be sure, the majority of circuit courts that have addressed the issue, including the Second Circuit, have held that under certain limited circumstances a district court may grant prospective relief consistent with the Supreme Court's holding in *Boys Markets*. *See United Parcel Serv., Inc. v. Local 804*, 698 F.2d 100 (2d Cir.1983); *Westmoreland Coal Co. v. Int'l Union, United Mine Workers of America*, 910 F.2d 130 (4th Cir.1990) (and cases cited therein). In *United Parcel Service*, the Second Circuit held that the driving force of the *Boys Markets* decision—the accommodation between the limitations of the NLGA and the national policy of encouraging resolution of labor disputes through arbitration—may be furthered in some cases by the issuance of a prospective injunction. *See id.* at 109–11. The court stated:

> We hold ... that a court may grant a prospective injunction, but only if it finds that the union has engaged in a pattern of strike activity and that there is a likelihood that it may repeat such violations in the future. In an egregious situation, an employer should not be forced to seek injunctive relief repeatedly when the union's conduct has shown flagrant disrespect for the arbitration process that is the quid pro quo for its no-strike promise. To hold otherwise would undermine the value of extrajudicial dispute resolution that is central to the *Boys Markets* decision.

*Id.* at 110. Before a district court may order prospective injunctive relief, it must "make specific findings based on evidence in the record as to the types of violations which have occurred in the past and limit injunctive relief to the likelihood of their recurrence, or to new and different kinds of violations which may be expected to

occur in the future." *Id.* at 111 (*quoting United States Steel Corp. v. United Mine Workers of America,* 534 F.2d 1063, 1077 (3d Cir.1976)).

In the instant case, the Post has not introduced evidence sufficient to support a finding by the Court that the NMDU has engaged in a "pattern of strike activity" or that there is a "likelihood that it may repeat such violations in the future." A single, relatively brief work stoppage, particularly in the context of the safety concerns that the arbitrator's award itself acknowledges as an integral part of the basis for the ruling, does not constitute a pattern of strike activity. No evidence has been presented that, since March 1, there have been any further work stoppages by the NMDU or that the NMDU has made any threats or done anything to indicate that a strike relating to Local 94's negotiations is likely to occur in the future. In fact, at the Court's hearing on April 6, 2007, defendant O'Keefe testified under oath that the union will honor its obligations under the CBA and will not strike in sympathy with Local 94 or any other union. Accordingly, the Court concludes that prospective injunctive relief is not warranted under the current circumstances in this case.

Because the Court finds that the requested injunction is not appropriate in light of the prohibitions contained in the NLGA, it need not decide whether the injunction would be warranted under ordinary principles of equity. *See Boys Markets,* 398 U.S. at 254, 90 S.Ct. 1583.

### III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the application of plaintiff NYP Holdings (Docket No. 1) for a preliminary injunction is DENIED.

The Clerk of Court is directed to close this case.

**SO ORDERED.**